430 A.2d 1075 (1981)
PETITIONER F., Petitioner Below, Appellant,
v.
RESPONDENT R., Respondent Below, Appellee.
Supreme Court of Delaware.
Submitted November 13, 1980.
Decided April 29, 1981.
Joel D. Tenenbaum (argued) and Eliot Alazraki of Woloshin & Tenenbaum, P. A., Wilmington, for petitioner below-appellant.
Alene S. Berkowitz (argued) and Garry G. Greenstein of Knecht, Greenstein, Schagrin & Berkowitz, Wilmington, for respondent below-appellee.
Before HERRMANN, C.J., DUFFY and HORSEY, JJ.
*1076 HERRMANN, Chief Justice:
In this appeal we are required to decide whether a man claiming to be the natural father has standing to petition for custody or visitation rights with regard to a child conceived and born during the marriage of the natural mother to another who claims the child as his own. The mother and her husband have jointly acknowledged parentage of the child, and oppose the petition.

I.
On December 6, 1977, the respondent ("mother") gave birth to a child. On the birth certificate, her husband ("husband") is named as the father of the child.
On December 8, 1977, the petitioner ("putative father") filed a petition in Family Court seeking custody or visitation rights with regard to the child, under 13 Del.C. §§ 721 and 727.[1] In his petition he alleged that he was the natural father of the child *1077 and that he was seeking custody of the child so that he might better provide for the needs of the child. In effect, his action was for a determination of his parentage of the child.
In response, the mother moved to dismiss the petition, alleging that, at the approximate time the child was conceived, she was married to and cohabiting with her husband; that she cohabited with her husband at the time of the birth of the child and that they continue to live together with the child and other children as a family unit; and that both she and her husband filed with the Prothonotary an affidavit, on February 13, 1978, certifying their parentage of the child.
The Family Court granted the mother's Motion to Dismiss, holding that the putative father lacked standing to file the petition for custody or visitation rights. The putative father appealed to the Superior Court, which likewise found him to be without standing. He now brings this appeal, claiming that the denial of standing deprives him of protections afforded by the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

II.
Initially, we must determine whether the Family Court and Superior Court were correct in their conclusions that the putative father lacks standing to assert his claim under the pertinent statutory law.
As has been indicated, under our Custody Statute (13 Del.C., ch. 7, Subchapter II), only a "parent" has standing to initiate a child custody proceeding under § 721 and only a "parent" denied custody is entitled to visitation privileges under § 727. The word "parent" is undefined anywhere in the Custody Statute. Since it is ambiguous in that Statute, we must interpret the word in the context of the Statute: Did the General Assembly intend to include a putative father, under the circumstances of this case, within the word "parent" as used in §§ 721 and 727?
We think it unreasonable to assume that such was the legislative intent. Unfortunately, we must construe the Statute without benefit of any record of legislative intent. Nevertheless, to assume otherwise would be to conclude that the General Assembly intended to open the door to the invasion of continuing family stability by any man, whatever his motive, who may choose to claim an illicit paternity, thereby not only endangering that stability but also refuting the time-honored presumption of legitimacy of a child born during wedlock. See 10 Am.Jur.2d, "Bastards" § 11 (1963).[2] Any such assumption of legislative intent would be incredible on its face; it is also contrary to the governmental interest of insulating a continuing marital and family relationship from the potentially ruinous effects of an outsider's claim to parentage of a child born ostensibly within wedlock.
The putative father here makes no distinction between biological parenthood and legal parenthood; he asserts that his claim of biological parenthood suffices to afford him standing to adjudicate that parenthood and to seek custody or visitation. We find this contention unacceptable. We hold that the word "parent," as used in § 721 and § 727, means a person standing in the legal relationship of parent to the child, i. e., one who is charged with the legal duties and responsibilities of parenthood and who is entitled to all the rights thereof. In the case of a married woman who bears a child, *1078 her husband is the legal father and parent, under the presumption of legitimacy, carrying the duties and responsibilities and entitled to the rights of parenthood. It is in that legal sense, we conclude, that the word "parent" is used in §§ 721 and 727. The General Assembly has demonstrated throughout the Statutes governing parents and children its distinction between a "parent" in the ordinary sense of the word, and a "natural father," a status which required an explicit definition. See 13 Del.C. § 901 and § 1101.[3] It may be reasonably assumed that the General Assembly could and would have made that distinction in the drafting of §§ 721 and 727 if it had intended to do so.
We conclude that the putative father has no standing, under §§ 721 and 727 and the facts and circumstances of this case, to seek custody or visitation.

III.
Our conclusion presents the constitutional issues raised by the putative father.

A.
He asserts that he is constitutionally entitled to a hearing on the issue of his paternity because the right of a natural father to custody of his children is a substantial liberty interest protected by the Due Process Clause. In support of this proposition, he relies solely upon Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
Stanley involved an Illinois statute which, upon the death of an unwed mother, made her children wards of the state, conclusively presuming the unfitness of the father and denying him any right to be heard. Stanley, the acknowledged unwed father, had lived intermittently with his illegitimate children and their mother for eighteen years. When the mother died, the children were taken from his custody to become wards of the state, without any determination that he was an unfit parent. The United States Supreme Court struck down the statutory presumption and held that due process guaranteed Stanley a hearing on his fitness, stating: "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." 405 U.S. at 651, 92 S.Ct. at 1212, 31 L.Ed.2d at 558. Acknowledging that the state had a legitimate interest in protecting the children's welfare, the Court in Stanley nevertheless found this interest outweighed by the "cognizable and substantial" interest of Stanley in maintaining a parental relationship with his children.[4]Id. at 652, 92 S.Ct. at 1213, 31 L.Ed.2d at 559.
In the present case, the putative father contends that Stanley affords due process protection to unwed fathers and that, consequently, he is entitled to an adjudication of his claim of parentage here. Stanley has been broadly interpreted as recognizing that unwed fathers are generally entitled to the protection of the Constitution. See Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1980); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); "Putative Fathers: Unwed, But No Longer Unprotected," 8 Hofstra L.Rev. 425 (1980). We fully agree with that concept as a general principle. It does not follow from Stanley, however, and the Supreme Court has not held in our view, that a man claiming paternity has a constitutionally protected interest in a determination *1079 of his parental status for purposes of obtaining custody or visitation rights with respect to a child conceived and born during the marriage and cohabitation of the child's mother to and with another who has not disavowed the child's legitimacy. Compare In re Lisa R., Calif.Supr., 13 Cal.3d 636, 119 Cal.Rptr. 475, 532 P.2d 123, cert. denied, 421 U.S. 1014, 95 S.Ct. 2421, 44 L.Ed.2d 682 (1975).[5] Unlike the instant case, Stanley did not involve the potentially uncertain and often turbulent issue of determining paternity; there, the unwed mother was deceased, the children had become wards of the State, and the unwed father was conceded by all parties to be the natural father. Stanley afforded constitutional recognition to the interest of a putative father "in the children he has sired and raised." That interest is certainly distinguishable from that of the putative father in this case who, in the eyes of the law and in actuality, is a stranger to the child. Most significantly, Stanley held that an unwed father's interest warranted due process protection "absent a powerful countervailing interest." In Stanley, there was no such interest; in this case, however, there exists the very powerful countervailing public interest in promoting the marital relationship, preserving intact an existing family unit, and protecting the minor child from confusion, torn affection, and the lifelong stigma of illegitimacy. Thus, even assuming arguendo that the putative father has a constitutionally cognizable interest, that interest would be outweighed by the competing public interest and public policy in this case, and he must be denied judicial access.
In a related vein, the putative father argues that the denial of standing terminates his parental rights, in contravention of the procedural rights afforded by Chapter 11 of Title 13, dealing with the termination and transfer of parental rights. 13 Del.C. §§ 1101-1113. The putative father correctly notes that that chapter explicitly recognizes that there may occur instances where the natural father of a child might be one other than the mother's husband, *1080 and affords certain procedural rights to such natural fathers. See 13 Del.C. §§ 1101(5), 1104(4), 1105(a)(5) and 1106(2)(c). However, we find his argument unconvincing. The termination of parental rights under the Statute occurs only in the context of the pending adoption of a child, a circumstance not present here. Moreover, the putative father cannot be said to have had his parental rights terminated when there has not been a judicial or legal determination that he has such rights, and, as we have held, he is not constitutionally entitled to judicial access by which to establish them at this time.[6]
We conclude, therefore, that the putative father has not been denied procedural due process in this case.

B.
The Court in Stanley also rested its decision on equal protection grounds. The putative father in the instant case, relying thereupon, contends that the denial of standing to seek custody or visitation privileges in this case violates the Equal Protection Clause. Specifically, he argues that the denial of standing to him unconstitutionally acts to favor the husband's interest in the child over the putative father's interest in asserting his own paternity. The argument is untenable.
Equal protection of the law "does not mean broadly that all persons howsoever situated shall have the same rights and be protected in the same things, but it means that all persons in like situations shall in those situations have an equal protection of the law." Van Winkle v. State, Del.Supr., 91 A. 385, 389 (1914). The Equal Protection Clause "forbids invidious discrimination, but doth not require identical treatment for all persons without recognition of differences in relevant circumstances." Priest v. State, Del.Supr., 227 A.2d 576, 579 (1967).
A husband and acknowledged legal father is in a vastly different situation from that of a man, outside the family unit, claiming to be the father. Dissimilar treatment is therefore fully warranted. The denial of standing in the instant factual circumstance is compelled in view of the legitimate public policy to foster harmonious marital relations, to guard against assaults upon the family unit, and to protect the minor child from the permanent stigma and distress which would undoubtedly result were we to decide otherwise. Thus, we find no Equal Protection violation.

* * * * * *
We arrive at our decision with a view toward the very strong policy considerations previously discussed. It has been written:
"The case of the married mother who brings into the world a child of someone not her husband lies differently. But it is not a difficult case either. The application of the presumption of legitimacy of a child born to a married woman would be in the child's interest in practically all cases. If the mother's husband does not disavow paternity, there is no reason to go after the child's true father. Whatever the current weight of the family protection argument may be, it certainly should prevent the illegitimate father from seeking to assert his claim to a child resulting from his union with a married mother. If, on the other hand, the mother's husband has disavowed paternity, no obstacle lies in the way of pursuing the child's father." (Emphasis supplied).
Krause, Illegitimacy: Law and Social Policy 77 (1971).
* * *
Affirmed.
NOTES
[1] 13 Del.C. § 721 and § 727 provide in pertinent part:

"§ 721. Commencement of custody proceeding; jurisdiction; notice; appointment of attorney for child.
"(a) A child custody proceeding is commenced in the Family Court of the State, or as otherwise provided by law, by a parent filing a petition seeking custody of the child in the county where the child is permanently a resident or where he is found." (Emphasis supplied).
"§ 727. Visitation privileges.
"(a) A parent not granted custody of the child is entitled to reasonable visitation privileges unless the Court finds, after a hearing, that visitation by the parent would endanger the child's physical health or significantly impair his emotional development." (Emphasis supplied).
[2] Over two centuries ago, Lord Mansfield stated: "The law of England is clear that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage * * *. [I]t is a rule founded in decency, morality, and policy * * *." Goodnight v. Moss, 98 Eng.Reprint 1257 (1777). This rule formed the basis for the so-called presumption of legitimacy  i. e. that a child born during wedlock is presumed to be legitimate  which is recognized, in some form, in virtually every state. The same basic truths behind the rule are deemed inherent in the legislative intent we perceive in §§ 721 and 727 to bar an outsider from seeking to illegitimize a child for personal motives, whatever they may be.
[3] 13 Del.C. § 901(5) (dealing with adoption) and 13 Del.C. § 1101(5) (dealing with the termination and transfer of parental rights in adoption proceedings) define "natural father" as "the biological male parent of a child."
[4] The Stanley Court relied in part upon prior cases which, dealing with the more traditional family unit, had held the rights to conceive and raise one's children to be basic and essential, e. g. May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).
[5] The California Supreme Court in In re Lisa R., Calif.Supr., 13 Cal.3d 636, 119 Cal.Rptr. 475, 532 P.2d 123 (1975) held that due process entitled a man claiming to be the natural father and seeking custody to a hearing in which to dispute a statutory presumption of the child's legitimacy and establish his own parental fitness, even though the child was born during the marriage of its mother to another man.

One distinction between Lisa R. and the instant case lies in that Court's characterization of Stanley as holding that "the state was required to afford a hearing to all unwed fathers who desire and claim that they are fit to care for their children when the mother cannot or will not provide that care. 119 Cal.Rptr. at 482, 532 P.2d at 130 (emphasis supplied). See Adoption of Rebecca R., Cal.App., 68 Cal. App.3d 193, 137 Cal.Rptr. 100, 102 (1977). Such was the case in Lisa R.: there the mother was deceased, as was the husband, and Lisa had become a ward of the Court.
Another distinction, under Stanley, between Lisa R. and the instant case is apparent in the following enunciation by the California Supreme Court of the private interests in that case which, when balanced against the competing state interests as required by due process, prevailed:
"The question whether appellant, as one claiming to be Lisa's natural father, can rebut the presumption that Lisa is the issue of her mother's marriage must thus be resolved by weighing the competing private and state interests.
"The private interests which appellant seeks to preserve in the instant case as in Stanley arose from more than the mere biological fact that he is Lisa's natural father. Lisa was not conceived as the result of a casual relationship. Appellant resided with Lisa's mother both before and after Lisa's birth and contributed to her support. The mother used appellant's name during this period, and he appears as Lisa's father on her birth certificate. Appellant lived with Lisa and her mother as a family for four or five months and was deprived of Lisa's custody only because Lisa's mother, over appellant's wishes, elected to take Lisa with her when she returned to her husband. Appellant's then-wife was aware of his living arrangements with Lisa's mother and gave her permission and encouragement for appellant's acknowledgment of Lisa as his child. * * * Appellant first discovered that Lisa had been adjudged a dependent ward of the court when she was three years of age and visited with her when he was able to do so. He thereafter has consistently sought to assert his rights as her father." 119 Cal.Rptr. at 483, 484, 532 P.2d at 131-32.
[6] In a related context, the putative father argues that, under the Termination of Parental Rights Statute, 13 Del.C. §§ 1104(4), he has standing to petition for a termination of parental rights, and contends that, if a putative father can petition for a termination of parental rights, he logically should be able to petition for custody or visitation privileges. We find no merit in this line of reasoning and reject the argument.