WESTINGHOUSE ELECTRIC CORPORATION,
Plaintiff-Appellant,

v.

John K. KING, Commissioner of Revenue, State of Tennessee, Defendant-Appellee.

Supreme Court of Tennessee, at Knoxville.

Sept. 10, 1984.

Thomas O. Helton, Carl E. Hartley, Barry W. Eubanks, Chattanooga, for plaintiff-appellant.

Joseph C. Peel, Asst. Atty. Gen., Nashville, for defendant-appellee; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

BROCK, Justice.

### I

The plaintiff, Westinghouse Electric Corporation (Westinghouse) brought this suit against the Commissioner of Revenue in the Circuit Court for Hamilton County, Tennessee, seeking recovery of taxes and interest paid under protest under the Business Tax Act, T.C.A., §§ 67–5801, *et seq.* (now T.C.A., §§ 67–4–701, *et seq.*). The taxes were paid for the years 1971–76 and were based upon the proceeds of contracts between Westinghouse and the Tennessee Valley Authority (TVA). The trial court found that the statute of limitations barred collection of the 1971 taxes, but it found Westinghouse liable for taxes and interest in all other years and entered judgment accordingly. Westinghouse is appealing the judgment raising issues concerning the nature of the business tax and its applicability to the transactions with TVA, the base from which the taxes were calculated, apportionment of the taxes, and statute of limitations.

Westinghouse is a Pennsylvania corporation, maintaining its principal office and place of business in Pittsburgh, Pennsylvania. It designs, manufactures and sells electrical equipment, products and supplies and is authorized to do business in Tennessee as a foreign corporation. At all times pertinent to this case, it had sales offices and manufacturing plants located throughout Tennessee.

Between 1968 and 1971, Westinghouse entered into four contracts with TVA whereby Westinghouse agreed to design, manufacture and sell nuclear steam supply systems and turbo-generator units to TVA for the Sequoyah Nuclear Plant and Watts Bar Nuclear Plant in Hamilton and Rhea Counties, Tennessee. All of the contracts were signed on or before January 26, 1971. At the time the contracts were negotiated, Westinghouse had sales representatives in Tennessee specifically assigned to TVA. Employees from Tennessee were part of the Westinghouse team which negotiated the contracts. According to the testimony of Mr. Franklin E. Rolston, Westinghouse's field sales representative working out of Chattanooga, the Tennessee marketing team "was responsible for the interface and coordination of any substantial project that Westinghouse would have to TVA." Westinghouse submitted all bids to TVA through its Chattanooga office.

The equipment purchased by TVA under the contracts was either manufactured or purchased by Westinghouse outside the state of Tennessee. TVA was to make progress payments as each unit of equipment was completed. Title passed to TVA when the payment was made. It is not disputed that in all instances title passed outside Tennessee.

Westinghouse also provided on-site technical assistance to TVA under the contracts. The duties of Westinghouse personnel at the sites included answering questions, interpreting drawings, assisting in setting up installation procedures, handling reports of defective components and maintaining a schedule of installation progress. Westinghouse technical advisers did not have the authority to supervise installation, but it was part of their job to insure that the equipment was installed according to its design in order to protect the warranties. The contract required that the equipment be able to perform. TVA retained 10% of the contract price until the systems were commercially operating. At the time of trial some ten to twelve years after the contracts were signed, commercial operation had not yet been reached.

During the tax period in question, the Chattanooga office of Westinghouse remained involved in the execution of the contracts. The hundreds of contract changes made necessary by regulatory changes and TVA's requirement of state of the art equipment were channeled through Chattanooga. The Chattanooga sales office participated in the resolution of problems encountered in the performance of the contract. Sales personnel visited the TVA sites regularly both to check on the progress of the installation and to solicit TVA business for other Westinghouse products. According to one Westinghouse employee, TVA's satisfaction with the manner in which the contracts were handled affected the possibility of Westinghouse's obtaining future TVA contracts.

In the period from June 1, 1971, to December 31, 1976, Westinghouse filed business tax returns but did not report the proceeds from the TVA contracts which it received during those years. On January 17, 1978, it paid under protest an additional $154,121.43 in business taxes based on the TVA contracts. After filing this suit for a refund, it paid under protest an additional $45,195.23 in interest. As stated above, the trial court awarded Westinghouse a refund of $9,282.35 plus interest for the tax year 1971, an action which is not now disputed by the Commissioner. Westinghouse, however, appeals the remainder of the trial court's order denying it a refund.

## II

The plaintiff insists that it did not exercise a taxable privilege within the statutory scope of the Business Tax Act. The taxa-

ble privilege relevant to this case is set out in T.C.A., §§ 67–5802 and 5805. According to § 67–5802:

"... the making of sales by engaging in any vocation, occupation, business or business activity enumerated, described or referred to in § 67–5805, classification 1, classification 2, and classification 3 is declared to be a privilege upon which each county and/or incorporated municipality in which said business, business activity, vocation, or occupation is carried on may levy a privilege tax...."

The Commissioner classified the business activities of Westinghouse under classification 2. Section 67–5805 provides in pertinent part:

"Businesses, vocations, and occupations which are taxable are set forth in the following classifications: provided, however, that each person shall be classified according to the dominant business activity.

\* \* \* \* \* \*

"Classification 2

"Each person engaged in the business of making sales of the following:

\* \* \* \* \* \*

"(f) Tangible personal property not specifically enumerated or described elsewhere in this chapter."

The State argues that the tax is on the privilege of engaging in business in Tennessee. Westinghouse stipulated that it was doing business in Tennessee, but insists that the statute does not impose an ordinary doing business tax. Rather, the statute requires both doing business and the making of sales within the state. Because the TVA contracts are not sales within the state, it argues that these transactions were not taxable.

▮▮▮ The primary purpose of statutory construction is to ascertain and give effect, if possible, to the intention or purpose of the legislature as expressed in the statute. *Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn.1977); *State ex rel. Rector v. Wilkes*,

222 Tenn. 384, 389, 436 S.W.2d 425 (1968). The Court should not lift one word or clause from a statute and construe it alone without reference to the balance of the statute. *State ex rel. Rector v. Wilkes*, *supra*, 222 Tenn. at 390, 436 S.W.2d at 427. Statutes relating to the same subject matter should be construed together. *Belle-Aire Village, Inc. v. Ghorley*, 574 S.W.2d 723 (Tenn.1978).

Westinghouse focuses on the language of § 67–5802 which taxes as a privilege "the making of sales by engaging in" certain enumerated business activities. This language, however, must be construed together with § 67–5805 which refers to "businesses, vocations and occupations which are taxable" and which classifies persons "according to the dominant business activity." It then taxes persons "engaged in the business of making sales" of certain enumerated items.

▮▮▮ The statute does not impose a tax on the sale as such. Rather, when construed together, the statutory provisions tax the privilege of doing business as that business is defined by the statute. The business of making sales of tangible personal property is a taxable privilege under the statute.[1] Thus, the statutory provisions pertinent to this case do not tax all business activity but only that business activity engaged in selling tangible personal property. This interpretation of the statute is in agreement with *Worrall v. Kroger, Co., supra*, 545 S.W.2d at 738, where we stated that in enacting the Business Tax Act in 1971:

"... the legislature undertook to create a system of state and local taxation *upon the privilege of engaging in certain types of business activities*, replacing certain parts of the privilege tax law of the state and providing for a classification of businesses for the state and local administration of the system of taxation established in the Act." (Emphasis added.)

---

1. Classification 4 of § 67–5805, on the other hand, taxes the privilege of engaging in the

business of contracting or performing a contract.

Westinghouse next argues that even if the tax is on the privilege of doing business by making sales, the statute does not tax the privilege of engaging in business by making sales when, as in the sales to TVA, title passes outside the state. Alternatively, Westinghouse contends that the base on which the tax is calculated is limited to sales in which title passes in-state.[2]

■ Both arguments are based on T.C.A., § 67–5804(b), which provides in pertinent part as follows:

"(b) 'Sale' means any transfer of title or possession, or both, exchange, barter, lease or rental, conditional, or otherwise, in any manner or by any means whatsoever of tangible personal property for a consideration, and includes the fabrication of tangible personal property for consumers who furnish, either directly or indirectly, the materials used in fabrication work, and the furnishing, repairing or servicing for a consideration of any tangible personal property consumed on the premises of the person furnishing, preparing, or serving such tangible personal property."

Although subsection (b) defines a sale as including, *inter alia*, a transfer of title, it does not place any significance on the place of the transfer of title. Indeed, we find no explicit language in this subsection or the remainder of the Act limiting the tax to transfers of title within the state.

■ There have been a number of United States Supreme Court decisions, however, which have addressed constitutional limitations on state taxation of the privilege of engaging in businesses which make sales with interstate aspects. By virtue of T.C.A., § 67–5820, these decisions are relevant in determining legislative intent regarding the extent to which the Business Tax Act can reach transactions that have interstate elements. Section 67–5820 provides:

"Legislative intent—Constitutional limitations acknowledged.—It is the legisla-

tive intent, within the framework of this chapter, to recognize that there are limitations upon state taxation imposed by the Constitution of the United States and of this state and not to impose the tax where prohibited therein; but it is intended to impose the tax to the extent permitted under such constitutions and the words of imposition used herein."

Westinghouse argues that decisions on the constitutionality of privilege taxes are inapplicable due to the special nature of the Tennessee statute. In light of our earlier discussion, we reject this argument.

■ As a general principle, a state may not lay a tax on the privilege of engaging in interstate commerce under the Commerce Clause. *General Motors Corporation v. Washington*, 377 U.S. 436, 446, 84 S.Ct. 1564, 1571, 12 L.Ed.2d 430 (1964). But it is not the purpose of the Commerce Clause

"to relieve those engaged in interstate commerce from the just share of state tax burden even though it increases the cost of doing the business." *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938).

Thus, a state may impose a tax if there is a sufficient local incident on which to base the tax. *General Motors Corporation v. Washington, supra*, 377 U.S. at 447, 84 S.Ct. at 1571.

In *Norton Co. v. Department of Revenue of State of Ill.*, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517 (1951), the taxpayer, a Massachusetts corporation with an Illinois branch office, complained of an Illinois tax on "persons engaged in the business of selling tangible personal property," the amount of the tax based on gross receipts. The Illinois office maintained an inventory and made direct sales to Illinois customers. When it lacked an item on its inventory, the Illinois office forwarded the order to Massachusetts. The goods were then shipped

---

**2.** The tax is one-fortieth (¹⁄₄₀) of one percent (1%) of all the wholesale sales of the business.

T.C.A., § 67–5806.

directly to the Illinois customer f.o.b. Worchester, Massachusetts.

■■■ The court upheld taxation as to all sales in which the Illinois branch either distributed goods or received orders. In language pertinent to the case before us, it stated that the taxpayer "cannot channel business through a local outlet to gain the advantage of a local business and also hold the immunities of an interstate business." 340 U.S. at 539, 71 S.Ct. at 381.

In *General Motors Corporation v. Washington, supra,* the taxpayer, General Motors, manufactured automobiles outside the taxing state of Washington, and then sold them to independent dealers within the state. To assist in the sales, General Motors maintained district managers within the state. A district manager worked out of his home. He met regularly with the dealers within his district, and assisted them in the preparation of orders. The orders were sent by the dealers to an out-of-state zone office. The orders were accepted or rejected out of state. Sales were completed by shipments f.o.b. the out of state factory. 377 U.S. at 442–445, 84 S.Ct. at 1568–70. In upholding the tax, the Court held that the activities of General Motors within the state were substantial, "particularly with relation to the establishment and maintenance of sales, upon which the tax was measured." *Id.* at 447, 84 S.Ct. at 1571.

The court again considered a Washington privilege tax in *Standard Pressed Steel Co. v. Washington Dept. of Rev.,* 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975).[3] The court set forth the following facts:

"Appellant, a manufacturer of industrial and aerospace fasteners (nuts and bolts generally), has its home office in Pennsylvania, one manufacturing plant there and another in California. Its principal customer in the State of Washington is the Boeing Company, in Seattle. In the years relevant here it had one employee, one Martinson, in Washington who was paid a salary and who operated out of his home near Seattle. He was an engineer whose primary duty was to consult with Boeing regarding its anticipated needs and requirements for aerospace fasteners and to follow up any difficulties in the use of appellant's product after delivery. Martinson was assisted by a group of engineers of appellant who visited Boeing about three days every six weeks, their meetings being arranged by Martinson. Martinson did not take orders from Boeing; they were sent directly to appellant. Orders accepted would be filled and shipment made by common carrier to Boeing direct, all payments being made directly to appellant. Martinson had no office except in his home; he had no secretary; but appellant maintained an answering service in the Seattle area which received calls for Martinson, bills for that service being sent direct to appellant." *Id.* at 561, 95 S.Ct. at 708.

The appellant argued that its connections to Washington were so thin as to make the tax a violation of due process. The court rejected this claim noting that the appellant's one Washington employee "made possible the realization and continuance of valuable contractual relations between appellant and Boeing." *Id.* The court rejected the Commerce Clause claim, relying upon *General Motors Corporation v. Washington,* which it found "almost precisely in point." *Id.* at 563, 95 S.Ct. at 709.

■■■ Before considering the facts in the instant case, we note as a prefatory matter that although the contracts were negotiated and signed prior to June 1, 1971, the effective date of the Business Tax Act, the Commissioner relies only upon activities in Tennessee on or subsequent to that date to show the involvement of Westinghouse's Tennessee offices in fulfilling the TVA contracts. Further, Westinghouse was taxed only on the basis of proceeds it received after June 1, 1971. Of course, receipt of the proceeds was dependent upon contracts

---

**3.** The Washington statute was similar to the Tennessee statute, taxing persons "in the business of making sales at wholesale." Wash.Rev. Code § 82.04.270.

signed prior to the Act. But the general rule is that a statute, including a tax statute, is not retroactive simply because it relates to antecedent facts. *Tower Plaza Investments, Limited v. DeWitt*, 109 Ariz. 248, 508 P.2d 324 (1973); *see e.g., Broadacre Dairies v. Evans*, 193 Tenn. 441, 246 S.W.2d 78 (1952) (Proceeds from lease entered into prior to enactment of tax but received subsequent to the same are subject to tax).

 Turning now to the facts, Westinghouse maintained marketing offices in Chattanooga and Knoxville. The Chattanooga office in particular served as a conduit between Westinghouse and TVA during the execution of the contract. The contract files were maintained in Chattanooga. The hundreds of changes required during the course of the contract were coordinated and executed by Chattanooga. Chattanooga sales personnel met frequently with TVA, processed TVA complaints regarding the project and worked with TVA on necessary modifications.

In addition, on-site Westinghouse engineers provided technical assistance to TVA in the installation of the equipment. Although Westinghouse personnel did not have supervisory authority, their technical assistance was required by the contract and clearly played an essential role in the whole transaction.

We thus have no difficulty in finding a sufficient local incident on which to base the tax. Westinghouse's activities in-state were at least as substantial as those in *General Motors Corporation v. Washington*, if not more so, and certainly more substantial than those in *Standard Pressed Steel*. We, therefore, conclude that Westinghouse exercised a taxable privilege during the tax years in question and that the Commissioner properly included the proceeds of the contract received during those years on Westinghouse's tax base.

 Westinghouse next complains that the tax is not properly apportioned. A tax not apportioned to the activities carried on within the state burdens interstate commerce the same as if the tax were on the privilege of engaging in interstate commerce. *Gwin, White & Prince v. Henneford*, 305 U.S. 434, 435, 438–39, 59 S.Ct. 325, 326, 327, 83 L.Ed. 272 (1939). Lack of apportionment risks multiple taxation, a risk not borne by purely local commerce. *Id.* The taxpayer, however, must demonstrate that it suffers from the burden of multiple taxation. *General Motors Corporation v. Washington, supra*, 377 U.S. at 449, 84 S.Ct. at 1572.

 Westinghouse has made no showing that it suffers from multiple taxation. Further, in both *General Motors Corporation v. Washington* and *Standard Pressed Steel*, cases with similar facts to the ones before us, the taxing statutes withstood attacks on apportionment grounds. In *Standard Pressed Steel*, the privilege tax was measured by the proceeds from sales to a Washington customer. The Supreme Court observed that the tax was " 'apportioned exactly to the activities taxed,' all of which are intrastate." 419 U.S. at 564, 95 S.Ct. at 709.

The Tennessee taxes levied on Westinghouse are measured by the sale proceeds from the goods delivered in Tennessee to a Tennessee buyer, T.V.A. Westinghouse maintained Tennessee offices for the sales. As in *General Motors Corporation* and *Norton Co. v. Department of Revenue of State of Ill., supra*, Westinghouse did not establish that its Tennessee activities "were not decisive factors in establishing and holding this market." *General Motors Corporation v. Washington*, 377 U.S. at 448, 84 S.Ct. at 1571–72. We, therefore, conclude that the taxes are properly apportioned.

### III

Westinghouse argues that the applicable statute of limitations bars collection of taxes for the years 1972 and 1973. The applicable statute for the 1972 claim is T.C.A., § 67–1323(a) (now T.C.A., § 67–1–1501(a)), which provides:

"(a) AD VALOREM AND LOCALLY COLLECTED PRIVILEGE TAXES.—All state, county, school and municipal taxes assessed on property, and all state, county or municipal privilege taxes (including, but not limited to, business, litigation, real estate transfer and mortgage taxes) collected by local officials for the benefit of cities, counties or the state shall be barred, and any lien for such taxes be cancelled and extinguished, unless the same are collected or suits for the collection shall have been instituted within six (6) years from the first of January of the year for which such taxes accrued."

■■ The determinative issue is when the tax "accrued." Westinghouse takes the position that the 1972 tax accrued on December 31, 1972, when it became payable. Accordingly, the statute began to run on January 1, 1972, expiring on January 1, 1978, prior to the collection of taxes on January 17, 1978. We disagree.

In *R.J. Reynolds Tobacco Co. v. Carson*, 187 Tenn. 157, 213 S.W.2d 45 (1948), the Court interpreted § 1494 of the Code of 1932, the predecessor of § 67–1323(a) and identical to it in all respects here pertinent. The Court stated:

"A Statute of Limitation runs only after the accrual of a complete right of action. *Columbian Mut. Life Ins. Co. v. Martin*, 175 Tenn. 517, 136 S.W. (2d) 52; 34 Am. Jur., 91. Code sec. 1494 provides that the Statute of Limitation commences to run from January 1st, of the year in which the tax accrues.

" '... the courts uniformly hold that a right of action generally accrues when the complainant can bring suit to recover *a sum of money alleged to be due and unpaid.*' *Henwood v. McCallum & Robinson, Inc.*, 179 Tenn. 531, 535, 167 S.W. (2d) 981, 982." (Emphasis in original.) *Id.* at 172, 213 S.W.2d at 51.

Then § 67–5807 provided that business taxes under classification 2 for the year 1972 would have been payable on December 31, 1972. The taxes were not, however, due on that day. The taxpayer was not required to file a return until March 1 of the following year, and the taxes did not become delinquent until that day. T.C.A., § 67–5807. Further, § 67–5808 (now T.C.A., § 67–4–719(b)) empowers the appropriate authority to issue a distress warrant for the collection of taxes only when the tax becomes delinquent.

Westinghouse's 1972 taxes did not become due and unpaid such that a cause of action accrued for their collection until they became delinquent on March 1, 1973. *See also, Grant Bond & Mortgage Co. v. Ogle*, 17 Tenn.App. 112, 120, 65 S.W.2d 1091 (1933) ("statute of limitations [§ 1494, 1932 Code] runs from the time they [the taxes] become delinquent"). The statute therefore began to run January 1 of the year of accrual, 1973, and the Commissioner collected the tax owed within six years.

In reaching this decision, we find that *Woods v. TRW, Inc.*, 557 S.W.2d 274 (Tenn. 1977), on which Westinghouse relies, is inapposite. In *TRW*, the parties stipulated among other facts that the six year statute began to run on January 1 of the tax year rather than of the following year. The resolution of the legal issue of accrual under § 67–1323(a) had no bearing on the issues on appeal and the parties did not address it. Likewise, we did not address this issue in our opinion. Our recitation as background of the stipulations of the parties, including the stipulation on the statute of limitations, does not constitute authority for the proposition that the statute began to run on January 1 of the tax year.

In arguing that collection of its 1973 taxes is time-barred, Westinghouse relies upon Public Acts of 1973, ch. 368, § 3(b) (now amended and codified at § 67–1–1501(b)), which provided in pertinent part:

"(b) ALL TAXES REQUIRING THE FILING OF RETURNS.—Notwithstanding the provisions of subsection (a) [of T.C.A. § 67–1–1501], the amount of any tax imposed under any title wherein the filing of a return is required shall be assessed within three (3) years from December 31 of the year in which such tax became due and payable, and no levy or other proceeding to enforce the collection

of such tax without such assessment shall be made or begun after the expiration of such period...."

Evidence was introduced at trial which attempted to show that the taxes were not assessed within the three year period required by the statute. We do not need to determine whether the assessment was timely since we hold that the 1973 Act is not applicable.

In Public Acts of 1974, ch. 484, § 2(b), the legislature replaced the language quoted above with the following:

" '(b) STATE TAXES REQUIRING THE FILING OF RETURNS: ASSESSMENT. —Notwithstanding the provisions of subsection (a), the amount of any tax imposed under any title, wherein the filing of a return is required by the state, shall be assessed within three (3) years from December 31 of the year in which the return was filed and no levy or other proceeding to enforce the collection of such tax without assessment shall be made or begun after expiration of such period; provided, however, that'; and"

This Act is presently codified at T.C.A., § 67–10–1501(b).

 Under the 1974 Act only state taxes must meet the three year statute of limitations on assessment. Business taxes which fall under classification 1–3 of T.C.A., § 67–5805, are not state taxes, but are instead local privilege taxes which each county and/or municipality is permitted to levy. Returns on these taxes are filed with the appropriate local government rather than the state. T.C.A., § 67–5807. By contrast, T.C.A., § 67–5803, specifically declares that the privilege of engaging in businesses which fall under classification 5 of § 67–5805 is a state privilege taxable by the state alone with the return to be filed with the Commissioner of Insurance. T.C.A., § 67–5807. Thus, if the 1974 Act is applicable to Westinghouse's 1973 taxes, as a privilege falling under classification 2, then Westinghouse was exercising a local privilege not affected by the three year limitation on assessment.

Under the 1973 Act, the limitation period on assessments began to run on December 31 of the year the tax was due and payable. For reasons discussed in the preceding issue, Westinghouse's 1973 taxes were not due until March 1, 1974. The three year limitation period would not have begun until December 31, 1974. The 1974 Act, however, replaced the 1973 Act on March 4, 1974. Accordingly, when the three year limitation period would have begun to run on the 1973 taxes, no such statute of limitation was in effect.

Having determined that the judgment of the trial court should be affirmed, we do not address the other arguments raised by the Commissioner in support of the judgment of the lower court.

The decree of the trial court is affirmed. The costs of this appeal are taxed to the appellant.

COOPER, C.J., and FONES, HARBISON and DROWOTA, JJ., concur.