**In the Matter of: "A"**

**George Edward CLINE, Petitioner/Appellant,**

v.

**Juanzel DREW and James Henry Drew, Jr., Defendants/Appellees.**

Court of Appeals of Tennessee, Western Section, at Knoxville.

May 15, 1987.

Application for Permission to Appeal Denied by Supreme Court

July 27, 1987.

Brenda McGee, Knoxville, for petitioner/appellant.

Robert R. Simpson, Knoxville, for appellees Tipton, Eshbaugh and Simpson.

W.J. Michael Cody, Atty. Gen. and Reporter, Nashville, Wayne E. Uhl and Debra K. Inglis, Asst. Attys. Gen., for the State, intervenor.

Stephanie L. Ganucheau, Knoxville, guardian ad litem.

TOMLIN, Presiding Judge, Western Section.

This appeal calls upon us to decide whether a man who claims to be the father of a child has standing to bring a paternity action in which he seeks to be declared the father, along with visitation rights and name change of a child born during the marriage of the natural mother to a man previously declared by the trial court to be the father of the child. Following the filing of a paternity petition by plaintiff in the Juvenile Court of Knox County pursuant to T.C.A. § 36–2–103, the case was transferred to the circuit court of that county for trial. The trial court dismissed plaintiff's petition on the ground that he lacked standing to bring such an action. On appeal plaintiff contends that the trial court erred in denying him standing, and that such denial deprived him of the protections afforded by the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution and Article I Section 8 and Article XI

Section 8 of the Tennessee Constitution. We find no error and affirm.

Inasmuch as plaintiff's complaint was dismissed pursuant to a Rule 12.02, T.R. C.P. motion, we are required to accept the allegations of his complaint as true and to construe those allegations liberally in his favor. *See Pemberton v. American Distilled Spirits Co.,* 664 S.W.2d 690 (Tenn. 1984). Plaintiff's complaint states that he began having an intimate relationship with defendant Mrs. Drew, then Ms. Hall, in 1976, and that they continued seeing each other until the fall of 1980. At the time the affair terminated plaintiff was not aware that Ms. Hall was pregnant. In October, 1980 Ms. Hall married the co-defendant James H. Drew, Jr. A daughter, whom we shall call "A," was born to Mrs. Drew in January, 1981.

Upon learning of "A"'s birth, plaintiff attempted to make contact with Mrs. Drew. He was allowed to see "A" at the residence of the maternal grandmother on a few occasions. From time to time he gave the grandmother money for "A"'s benefit and occasionally purchased gifts for her. Plaintiff was unsuccessful in attempting to visit "A" regularly. Some three years later in June, 1984, plaintiff filed a *pro se* petition seeking legitimation in the Knox County Juvenile Court, identifying the daughter as "S," the name by which he knew her. At a hearing on plaintiff's legitimation petition Mrs. Drew did not inform the court that she was married to James Drew when her daughter was born, nor did she reveal to the court the child's legal name. That court ordered blood tests but they were never carried out. A month later Mrs. Drew filed a petition to have her husband, James Drew, declared to be the father of her child. In that petition the child's true name was used. Inasmuch as Ms. Hall and Mr. Drew were already married when the child was born, the court found that the child was already legitimate. At the time that plaintiff's legitimation petition came on to be heard the court realized that the child named in that petition as well as in the action of Mrs. Drew was the same, and plaintiff's petition was dismissed.

Approximately a year later, in October, 1985, plaintiff filed an amended complaint which contained the allegations heretofore recited, seeking to establish his paternity of "A." The juvenile court appointed a guardian *ad litem* at plaintiff's request. As already noted, following the transfer of this case to circuit court, the plaintiff's suit was dismissed for lack of standing. Thereafter, counsel for both parties advised the trial court that the dismissal of plaintiff's suit potentially implicated the constitutionality of T.C.A. § 36-2-101, et seq. The court directed plaintiff's counsel to notify the Attorney General that the constitutionality of a portion of the statute had been drawn into question. Notice was duly given.

## I. STANDING.

The threshold issue to be considered is whether the trial court was correct in ruling that plaintiff as the putative father lacked standing to assert his claim under the Tennessee Paternity Statute.

T.C.A. § 36-2-103 reads as follows:

*Petition to establish paternity—Time of filing—Jurisdiction—Issuance of warrant.*—(a)(1) A petition to establish paternity of a child, to change the name of the child if it is desired, and to compel the father to furnish support and education for the child in accordance with this part may be filed by the mother, or her personal representative, or, if the child is likely to become a public charge by the state department of human services or by any person.

(2) The petition may be filed in the county where the mother or child resides or is found or in the county where the putative father resides or is found. The fact that the child was born outside this state shall not be a bar to filing a petition against the putative father.

(3) After the death of the mother or in case of her disability the petition may be filed by the child acting through a guardian or next friend.

(b) Proceedings to establish the paternity of a child may be instituted before

or after the birth of the child and until one (1) year beyond the child's age of majority. These proceedings shall not affect the relationship of parent and child as established in § 31–2–105.

(c) For the purpose of this part, original and exclusive jurisdiction is conferred upon the juvenile court.

(d) The petition shall be verified by affidavit and shall charge the person named as defendant with being the father of the child and shall demand that he be brought before the court to answer the charge.

(e) The court shall issue a warrant for the apprehension of the defendant, directed to any officer in the state authorized to execute warrants, commanding him without delay to apprehend the alleged father and bring him before the court, for the purpose of having an adjudication as to the paternity of the child, and such warrant may be issued to any county of this state. But in the discretion of the court, a summons may be issued as in civil cases.

█ At first blush, one reading plaintiff's brief and argument might conclude that plaintiff brings this action for the singular purpose of having himself declared the putative father of "A" so that he might guarantee proper support for her in the future. However, after reading the prayer of his complaint delineating the relief sought, a different picture is perceived. Plaintiff not only seeks to be declared the natural father of "A" and to furnish support for her, but in addition, he seeks "reasonable visitation rights," the setting aside of the order declaring defendant James Drew to be the father of "A", and that "A"'s last name be changed to "Cline." As stated in the statute and held by this Court, the purpose of the paternity statute is to compel the father to furnish support and education for the child. *Frazier v. McFerren,* 55 Tenn.App. 431, 402 S.W.2d 467, 471 (1964).

█ Those who might be proper plaintiffs are described in the statute as "the mother, or her personal representative, or, if the child is likely to become a public charge by the state department of human services or by any person." Plaintiff contends that the phrase "any person" is a catch-all phrase and includes the putative father. To contend that this was the legislative intent in drafting the statute defies logic. While the phrase "any person" standing alone might be considered to be all encompassing, when a court engages in statutory construction it seeks to give effect to the intent or purpose of the legislature. It cannot lift one word from the statute and attempt to construe it alone without reference to the statute as a whole. *See Westinghouse Electric Corp. v. King,* 678 S.W.2d 19 (Tenn.1984). When this statute is considered in its entirety it becomes apparent that to include the putative father as "any person" would be contrary to legislative intent.

T.C.A. § 36–2–103 speaks in terms of compelling the father to furnish support. Sub-section (2) of section (a) states that the fact a child is born outside the state "shall not be a bar to filing a petition against the putative father." Section (b)(1) speaks in terms of compelling "the father" to furnish support. Section (d) of the statute states that the petition "shall charge the person named as defendant with being the father of the child and shall demand that he be brought before the court...." Lastly, section (e) reads in part: "The court shall issue a warrant for the apprehension of the defendant, directed to any officer in the state authorized to execute warrants, commanding him [the officer] without delay to apprehend the alleged father and bring him before the court...."

Without exception, this language clearly indicates that the statute contemplates that the defendant in an action to establish paternity will be the putative father. If the term "any person" were to be construed to include the putative father, this would in effect allow the putative father to bring an action against himself. Clearly, this is not what the legislature had in mind.

As already noted, the purpose of the statute is to provide a means to compel the father to support the child. It is not the purpose of this statute to create parental

rights between parent and child. That is the purpose of the legitimation statutes. As noted in *Queen v. Jolley*, 219 Tenn. 427, 410 S.W.2d 416, 418 (1966): "We do not agree the suit is a bastardy proceeding. The father here admits his relation to the child. A paternity proceeding is brought *against* the alleged putative father to establish paternity." (emphasis added)

Furthermore, a reading of the statute clearly demonstrates that a suit such as this can be brought only by persons having some type of legal relationship with the child. The best interests of the child are always paramount, and only those persons can determine what is in the child's best interest. A construction of the statute advocated by plaintiff would

> open the door to the invasion of continuing family stability by any man, whatever his motive, who may choose to claim an illicit paternity, thereby not only endangering that stability but also refuting the time-honored presumption of a legitimacy of a child born during wedlock.... [I]t is also contrary to the governmental interest of insulating a continuing marital and family relationship from the potentially ruinous effects of an outsider's claim to the parentage of a child born ostensibly within wedlock.

*Petitioner F. v. Respondent R.*, 430 A.2d 1075, 1077 (Del.1981). This issue is without merit.

## II. THE CONSTITUTIONAL ISSUES.

Having held that he does not have standing, we must consider the constitutional issues as raised by the putative father.

### A. THE DUE PROCESS CLAIM.

Plaintiff contends that he has a constitutional right to a hearing on the question of his paternity, because his right to assert paternity is a liberty interest that is protected by the due process clause of the United States Constitution and the "law of the land" provision of the Tennessee Constitution.

In asserting this claim plaintiff relies upon *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and *Lehr*

*v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In *Stanley*, the Supreme Court stated: "The private interest here, that of a man in the children he has *sired and raised*, undeniably warrants deference and, absent a powerful countervailing interest, protection." 405 U.S. at 651, 92 S.Ct. at 1212. (emphasis added). The facts in both *Stanley* and *Lehr* are substantially different from those in the case before us. In *Stanley* the court dealt with an Illinois statute which, following the death of an unwed mother, made her children wards of the state. The unfitness of the putative father was conclusively presumed by the statute and he was denied any right to be heard. It was undisputed that the one seeking to establish paternity had fathered, lived with, raised and supported the children for some eighteen years. At the death of the mother the children were taken from Stanley and made wards of the state without any positive determination that he was an unfit parent. The United States Court struck down the statutory presumption, holding that due process guaranteed Stanley a hearing on the question of fitness.

In *Lehr*, the putative father sought to invalidate an adoption order in favor of the biological mother and her husband. In so holding the court stated:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban* [*v. Nohammed*], 441 U.S. [380], at 392, 99 S.Ct. [1760], at 1768 [60 L.Ed.2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." *Id.*, at 389, n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role

it plays in 'promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109–2110, 53 L.Ed.2d 14 (1977) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 231–233, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15 (1972)).

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

463 U.S. 261–62, 103 S.Ct. at 2993.

Plaintiff also relies on the recent California case of *In re Lisa R.,* 13 Cal.3d 636, 119 Cal.Rptr. 475, 532 P.2d 123 (1975). As can readily be seen, this case is also distinguishable. While the minor child, Lisa R., was presumed to be legitimate, both of her parents were dead. The child had been adjudicated a dependent of the juvenile court. In the face of adoption proceedings by prospective foster parents, Lisa's putative father sought to obtain visitation rights and establish his paternity. The California Supreme Court held that the Evidence Code's Preclusion of Proof of Paternity violated the constitutional guarantee of due process.

The inapplicability of these two cases to the case at bar is readily described in the recent California case of *Michelle W. v. Ronald W.,* 39 Cal.3d 354, 216 Cal.Rptr. 748, 703 P.2d 88, 92 (1985), wherein the Supreme Court noted:

The difference between the state threatened dissolution and termination of a developed parent-child relationship in *Stanley* and *Lisa R.* and the denial of a legal determination of paternity in the case at bench is clear and significant.

As we recently noted, "In both *Stanley* and *Lisa R.,* the putative fathers were seeking to establish their legal relationship with children who otherwise had no parents and were wards of the state." (*Estate v. Cornelious* (1984) 35 Cal.3d 461, 466, 198 Cal.Rptr. 543, 674 P.2d 245, app. dism. (1984) 466 U.S. 967, 104 S.Ct. 2337, 80 L.Ed.2d 812.)

This is not a case where the state had attempted to intervene or to prevent the establishment of a relationship between putative father and child. Rather, Donald R. seeks a determination that he is Michelle's "legal" father, notwithstanding the established and continuing emotional and financial father-daughter relationship between Michelle and Ronald. Accordingly, we conclude that Donald's abstract interest in establishing paternity is not as weighty as the interests of the fathers in *Stanley* and *Lisa R.*

Throughout all the cases which have considered the extent to which a putative father's biological relationship with his child conflicts with a countervailing interest of an existing family unit, it appears with consistency that the courts have sought to balance the interests of the putative father, the parents, the child and the state. Furthermore, in so doing, the standard consistently applied is the "best interests of the child." *See Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). Furthermore, in this state, what is in the best interests and welfare of the child is always given first priority in dealing with child custody matters. *Walker v. Walker,* 656 S.W.2d 11, 16 (Tenn.App.1983).

█ It is our opinion that in the case at bar there are countervailing state interests that override whatever private interest the plaintiff may have in a relationship with his child. In his brief filed on behalf of the state, the Attorney General correctly identified three main state interests which he claims justify the prohibition of paternity suits by putative fathers in cases such as this: marital harmony, preservation of the family unit and the best interests of the child. In *P.B.C. v. D.H.,* 396 Mass. 68, 483 N.E.2d 1094 (1985), the Massachusetts Supreme Court declined to recognize a constitutional right of a putative father to an

adjudication of whether he was the father of a child conceived while the child's mother was married to another man, stating:

> A challenge to the presumption that the husband is the child's father, brought by a stranger to the marriage, such as the plaintiff, has the likely effect of seriously disrupting an intact marriage and family contrary to the interests of the Commonwealth. When the same challenge is made by someone within the family, the ruptures in the marriage and the family, most often, have already taken place, and even when the family is intact, those within the family are in far better position than is an outsider fairly to decide whether the family can survive the challenge presented by litigation of the paternity issue.

A similar case, *Petitioner F. v. Respondent R.*, 430 A.2d 1075 (Del.1981), upheld the action of the trial court in dismissing the custody suit and visitation for lack of standing of the putative father of a child conceived and born during the marriage of the natural mother to another man. The court stated:

> [I]n this case, however, there exists the very powerful countervailing public interest in promoting the marital relationship, preserving intact an existing family unit, and protecting the minor child from confusion, torn affection, and the lifelong stigma of illegitimacy. Thus, even assuming *arguendo* that the putative father has constitutionally cognizable interest, that interest would be outweighed by the competing public interest and public policy in this case, and he must be denied judicial access.

*Id.* at 1079.

A putative father's rights in his children are afforded constitutional protection. "The most effective protection of the putative father's opportunity to develop a relationship with his child is provided by the laws that authorize formal marriage and govern its consequences." *Lehr v. Robertson*, 463 U.S. 248, 263, 103 S.Ct. 2985, 2994, 77 L.Ed.2d 614 (1983). Plaintiff, having cohabited with Mrs. Drew voluntarily assumed the risk—for want of a better term—of the conception of a child. Having done so without the benefit of the institution of marriage, he also voluntarily assumed the risk of loss of the legal benefits of marriage, which included a relationship with any child produced from that marriage. While this avenue of a legal relationship was once available to plaintiff, it no longer is.

Other limited remedies exist. As already noted, a putative father registry has been created and is maintained by the Department of Human Services. Plaintiff has already availed himself of this right. Another is voluntary support of the child. He is free to contribute to the support and education of the child to the extent that he desires. As he has already done, a putative father may set up a trust fund for the exclusive use and benefit of his child. In addition, he can provide for the child in his will as well as designating the child to be the beneficiary under any life insurance that he might carry.

Considering the relief sought by plaintiff, it seems apparent that this action is one for legitimation rather than to provide support. To accomplish plaintiff's goals it would be necessary to illegitimatize "A" in order to have her declared plaintiff's daughter. While this apparently presents no problem to plaintiff, in the opinion of this Court it would be devastating to "A" as well as to her family. The guardian *ad litem* admitted in oral argument that plaintiff's suit, if successful, would make "A" illegitimate. However, she was quick to state that in light of today's views on illegitimacy, it would matter little in the eyes of the general public. This Court does not share her views.

Whether the suit was successful or not, an outsider such as the plaintiff in this case would wreak havoc with his former cohabitor's marriage as well as causing the child untold heartaches, fear and anxiety. Irreparable damage could be done. These obvious results which we have delineated reinforce our conclusion that the denial of standing to a putative father under the statute is proper, practical and constitutional.

**B. EQUAL PROTECTION.**

■ Plaintiff likewise contends that the Tennessee paternity statutes impermissibly

discriminate between mothers and natural fathers, and that this discrimination violates the equal protection clause of Article XI § 8 of the Tennessee Constitution and the Fourteenth Amendment of the United States Constitution. More specifically, he argues that T.C.A. § 36–2–103 creates a gender-based distinction which is not substantially related to an important governmental objective.

In our opinion, the statute does not create a gender-based classification. It does not discriminate between mothers and natural fathers but between those persons who have a legal relationship with a child, whether male or female, and those who do not. Under our statute, a suit may be brought by the child, whether male or female; it may be brought by an interested relative or friend, male or female; by the mother's husband, or by the Department of Human Services, which is neither male or female. Thus, it is clear that the statutory designation of potential plaintiffs is not limited to females. As stated by the Supreme Judicial Court of Massachusetts in the case of *P.B.C. v. D.H.*, 396 Mass. 68, 483 N.E.2d 1094, 1098 (1985):

> That the distinction between those who may initiate paternity proceedings and those who may not do so is not based on sex is enough to defeat the plaintiff's argument. Further discussion, however, is appropriate. Even though no gender-based classification has been established, "[e]qual protection of the laws requires ... that all persons in the same category and in the same circumstances be treated alike." *Opinion of the Justices*, 332 Mass. 769, 779–780, 126 N.E.2d 795 (1955). That requirement is met here. The plaintiff is not "in the same category and in the same circumstances" as the mother and her husband, the presumed father, who, with the child in question and another child, constitute a family unit. A challenge to the presumption that the husband is the child's father, brought by a stranger to the marriage, such as the plaintiff, has the likely effect of seriously disrupting an intact marriage and family contrary to the interests of the Commonwealth. When the same challenge is made by someone within the family, the ruptures in the marriage and the family, most often, have already taken place, and even when the family is intact, those within the family are in far better position than is an outsider fairly to decide whether the family can survive the challenge presented by litigation of the paternity issue. These considerations justify treating persons outside the family differently from persons within it.

This state has an interest in preserving and protecting the integrity of the family unit. It is also dedicated to protecting the best interests of the child. Notwithstanding the liberalization of attitudes in this country toward divorce, premarital sex and new ways of raising a child, we hold that a child has a right to legitimacy, and that the right is one that this state and its courts are obliged to protect during the minority of a child.

As was stated by the Supreme Court of Delaware in *Petitioner F. v. Respondent R.*, 430 A.2d 1075, 1080 (Del.1981):

> A husband and acknowledged legal father is in a vastly different situation from that of a man, outside the family unit, claiming to be the father. Dissimilar treatment is therefore fully warranted. The denial of standing in the instant factual circumstance is compelled in view of the legitimate public policy to foster harmonious marital relations, to guard against assaults upon the family unit, and to protect the minor child from the permanent stigma and distress which would undoubtedly result were we to decide otherwise.

There is no merit to plaintiff's equal protection argument.

The judgment of the trial court is affirmed. Costs in this cause are taxed to plaintiff, for which execution may issue if necessary.

CRAWFORD and FARMER, JJ., concur.