Mona K. RUGGLES, Respondent
Below, Appellant,

v.

George RIGGS, Jr., Petitioner
Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 3, 1984
Decided: April 26, 1984.

·Hank R. Bernstein, Wilmington, for appellant.

George Riggs, Jr., Pro se, Smyrna, for appellee.

Before HORSEY, MOORE and CHRISTIE, JJ.

MOORE, Justice:

This appeal by Mona K. Ruggles challenges a decision of the Superior Court, which affirmed an order of the Family Court requiring her two young sons to visit their putative father, George Riggs, a convicted rapist, in prison.[1] It is an issue of first impression in this Court.

1. The Court has used pseudonyms to protect the identities of the parties and children.

2. Because we consider this visitation order to be unwarranted, we have ordered it stayed pending issuance of our decision. As yet the appellee, George Riggs, has done nothing to defend this appeal. He has not filed a brief and has refused to accept any communications from the Court

The mother contends that: the record does not support the Family Court order, the trial judge comingled the record of another matter with this one, and, except for reliance on a brief ex parte conversation with a psychiatrist, the trial court wholly ignored questions relating to the children's physical health, emotional development and general best interests, ignored issues of paternity raised by the mother, and without authorization of law summarily stigmatized these children with the public taint of illegitimacy by sua sponte notifying the Bureau of Vital Statistics that the person shown on the children's birth certificates as their legitimate father, was not entitled to that designation. After a careful review of the record, we agree and reverse. Since we view the totality of circumstances as amounting to a serious abuse of discretion by the Family Court, we remand with instructions that if a further petition is filed for visitation with these children, the matter is to be reassigned to a different judge. Moreover, the Family Court will be instructed to immediately withdraw its unauthorized sua sponte actions affecting the legitimacy of these children.

I.

The appellee, George Riggs, is now serving a 20 year sentence in prison for the crime of rape. By a pro se petition in the Family Court he sought, and was granted, the right to compel prison visits by two young children born to Mona K. Ruggles.[2] The older child, Edward, is seven. His younger brother, Bruce, is five. Edward's paternity is in doubt, while there is no question as to Bruce's. The latter, it is alleged, is the product of a rape by George upon Mona.

regarding his right to do so. While Rule 33 would permit us to resolve the appeal against him on the basis of these delinquencies, we view the matters and issues presented as far too serious for such peremptory disposition. Thus, we address the merits and the grave questions they present.

The mother strongly opposes any prison visitations by her sons with this man. She and George never married each other, although they once lived together on a sporadic basis. The record indicates that he is a violent person, which contributed to the break up of their relationship. Originally, the births of these children were registered under Mona's maiden name. She has since married a man, Thomas Ruggles, who fulfills the role of father to her sons, both emotionally and financially. Even though he is not their natural father, Thomas has tried to relieve these boys of the stigma of their illegitimate births by acknowledging them as his own children pursuant to 13 *Del.C.* § 1301.[3] As a result, new birth certificates have been issued to Edward and Bruce showing them to be the legitimate sons of Mona and Thomas. Although George knew of this, he has not taken any action to rescind the issuance of these birth certificates, or otherwise to challenge this legitimation procedure.

This matter has a rather convoluted history in the Family Court. Originally, two petitions were filed seeking visitation with these children. One was on behalf of George Riggs' parents (the "grandparent" matter),[4] and the other was filed by George (the prison visitation matter). The Family Court initially treated both petitions as being part of the same civil action. However, they were tried separately, and eventually given different file numbers. The grandparent matter was heard first, and visitation was ordered with George's parents over the strong objections of Mona and her husband, Thomas. While the propriety of the action to legitimate the children was not before the Family Court in the "grandparent" matter, the trial judge nevertheless challenged this procedure and sua sponte advised the Delaware Division of Public Health, Bureau of Vital Statistics that there was a *"problem"* as to the boys' legitimacy. In its order of May 5, 1983, the Family Court directed that:

"4. A copy of this disposition shall be filed by the prothonotary of New Castle County with the acknowledgment of paternity referred to herein and a copy shall also be sent to the Division of Public Health, Bureau of Vital Statistics Dover, Delaware, ..."

Shortly thereafter the Vital Statistics Director wrote the trial judge asking whether the effect of this order was to require a further change to the children's birth certificates. The Family Court acknowledged that it had no authority to take the action in question, but responded:

"1. I am unaware of any statutory authorization for the Family Court to enter an order authorizing the relief that you suggest.

2. Even if this court does have that power Thomas [R...] has not been a party to any proceeding in this court and, therefore, the court would be unable to enter an order that would materially affect his rights.

It is my suggestion that the situation remain precisely as it now is. *I think it is imperative* that any person checking the prothonotary's records or the birth

---

3. This statute provides:

A child conceived out of wedlock shall be legitimate if the parents shall marry before the birth of the child or if they shall marry after adjudication or acknowledgment of parentage after the birth of the child, or upon acknowledgment of the paternity made in writing by the parents, if both are living or by the father if the mother is not living and filed in the Prothonotary's office of any county of the State. *Id.* § 1301.

4. Under 10 *Del.C.* § 950(7) (Supp.1982) grandparents may be accorded visitation rights with their grandchildren. That statute provides in pertinent part:

"In any civil action within the jurisdiction of this Court and upon the petition of a person properly before it, the Court may:

\* \* \* \* \* \*

(7) Upon petition thereto, grant grandparents reasonable visitation rights as the Court shall determine with respect to the grandchild, regardless of the marital status of the parents of the child or the relationship of the grandparents to the person having custody of the child."

*Id.* § 950(7) (Supp.1982).

records of the children be apprised that there is a *problem* with what has been done." (Emphasis added.)

There is no indication in the record that the parties were privy to this correspondence between the Family Court and the Bureau of Vital Statistics until the trial judge disclosed it over a month later, when he denied Mona's motion for reargument. Despite the mother's protests that the Family Court had taken it upon itself to "bastardize" her children, the trial judge adhered to his sua sponte action:

"My purpose in the [order] *was to make it clear* that there is a *problem* with respect to the acknowledgment of paternity that was filed with the prothonotary of New Castle County. Nothing more than that." (Emphasis added.)

Furthermore, it appears from the record that the Family Court relied, at least in part, on these prior "grandparent" proceedings in ordering the children's prison visits with George. There is a common thread which clearly is traceable to the positions the mother and her husband took in the "grandparent" proceedings. There, the trial judge stated:

"When Thomas ... took the stand, it became obvious to the court that he may be the main disturbing factor in this situation. He is the one who took an *aggressive* stance and *asked about the possibility of appeal*. It is obvious that he is antagonistic and that his antagonism affects (Mona's) judgment and the grandparents' visitation with the children. *This* the court will not permit.... (Mona) was *cautioned* to make her own decisions in the matter and not let those decisions be made by (Thomas) who it appears to the court would *blithely lead*

her into a position where her own relationship with her children might be adversely affected." (Emphasis added.)

The prison visitation matter now before us was heard almost five months later. The Family Court made a pointed reference to Mona's and Thomas' earlier opposition to visitation in the "grandparent" matter. Thus, the skein of thread knotting the two actions together became apparent when the trial judge stated:

"The court must compliment (Mona) on the improvement in her attitude *since her last court appearance*. She appeared *alone* with her attorney and was quite *reasonable* at all times." (Emphasis added.) [5]

Aside from the testimony of George, who sought this prison visitation, and Mona, who opposed it, the only other information upon which the Family Court relied was a brief ex parte communication with a psychiatrist who neither saw these children, nor evaluated them in any professional manner. In an addendum to its order, the Family Court stated:

"I failed to mention in the above disposition which is being recirculated today that with the consent of the parties I spoke with Patricia A. Keeler, M.D., staff psychiatrist, following the hearing for *an indication* as to whether the children would be harmed visiting with their father in prison. *I briefly outlined the situation to Dr. Keeler to help her in her judgment.* Dr. Keeler was of the view that these visitations would not be harmful to the children particularly *if the mother were supportive* in promoting the visitation arrangements. A possibility exists, of course, that if the mother were not supportive then there might be

---

**5.** It also appears that on appeal the Superior Court comingled the "grandparent" matter with George's present petition for prison visitation with the children. In its opinion affirming the Family Court on the prison visitation matter, the Superior Court stated:

"... the paternal grandparents (sic) of the two children in question filed a petition for visitation of the children in accordance with 10

*Del.C.* § 950(7) which grants visitation rights to grandparents. After a hearing on February 12, 1982, the Family Court granted visitation rights in a decision which reflected [the stepfather's] animosity. That decision further noted that [the stepfather] was not the father of the children and 'may not be allowed to decide these matters'."

some concern. I do, of course, *expect* respondent to be supportive of the court ordered visitations." (Emphasis added.)

That is the state of this record upon which the challenged order was entered by the Family Court.

## II.

■ We begin with certain basic principles. There is no automatic or inviolable right by a putative parent to insist upon or obtain visitation with a child. The issue turns on the paramount questions of the child's best interests and welfare. Annot., 15 A.L.R. 3d 887 (1967). These assume even greater importance when a court is asked to force young children to visit a man in prison whose paternal rights are questionable at best. Our statutory law is consistent with these principles. The right to visitation is governed by 13 *Del.C.* § 727(a), which provides in pertinent part:

> "A *parent* not granted custody of the child is entitled to *reasonable* visitation privileges unless the Court finds, *after a hearing*, that visitation by the parent would endanger the child's physical health or significantly impair his emotional development."

*Id.* § 727(a) (Emphasis added).

■ Thus, the benefits of the statute may only be claimed by a *parent* seeking "reasonable visitation privileges" if the court finds *after hearing* that such visitation would not be harmful to the child. Such inquiries assume major importance under the circumstances here. Considering the applicable legal requirements, it is ap-

parent that there was little or no hearing in this case.[6]

■ Thus, we turn to the Family Court's ex parte communication with a staff psychiatrist upon which the trial judge relied in support of his prison visitation order. This Court has previously stated that ex parte consultation by a trial judge with experts has no place in the judicial process. *Phillips v. Delaware Power & Light Co.,* Del.Supr., 216 A.2d 281, 285 (1966); *Barks v. Herzberg,* Del.Supr., 206 A.2d 507, 509 (1965). The situation here is even more serious. There is no indication of what the trial judge "briefly outlined" to the psychiatrist "to help her in her judgment". Under the circumstances described she obviously could not have given the matter much attention, and at best, rendered an off-the-cuff opinion. There is no record of the facts or theories on which the expert relied or of the expert's familiarity with the case. The Family Court also failed to ascertain whether the "supportive" role, which was to be required of the mother, was within the realm of reason under all the circumstances. Moreover, after noting the expert's conclusion that visitation would not be particularly harmful if the mother were supportive, the judge in effect ordered her to be supportive. At the trial level the Family Court's action had the effect of precluding cross-examination of the psychiatrist, and on appeal it severely limits the ability of this Court to review the bases on which the Family Court acted.

■ While the trial judge obtained Mona's "consent" to this procedure, we

---

**6.** George Riggs' pertinent testimony in support of these prison visits consumes less than a page of the transcript. It hardly sustains a claim, or even a suggestion, that such visits are in the children's best interests. He testified:

> THE COURT: And, uh, why do you think it would be beneficial for the visitations to resume? First of all, do you think it would be *beneficial for you* to see the children?
> MR. [RIGGS]: Yes.
> THE COURT: And, uh, why is that? Because you love them?
> MR. [RIGGS]: Yes. Well, I don't know about them. It would probably be rough at first.

But, I think we could, uh, smooth it out after a period of time.
> THE COURT: Do you think, do you think it would be rough on the children at first?
> MR. [RIGGS]: Yeah, I think—well, not really —I, I didn't mean to say that. It would probably be kind of strange.
> THE COURT: Strange for the children?
> MR. [RIGGS]: Uh, . . .
> THE COURT: Can you see any advantage for the children seeing you on a regular basis?
> MR. [RIGGS]: *I don't see any disadvantage.*
> (Emphasis added).

seriously doubt the efficacy of that action.[7] It is evident that these people are of limited means and education. A litigant should not be required to "consent" to such an irregular course without the record clearly establishing that he or she fully understood all the ramifications of the "consent" being given. This is particularly so given the secrecy and closed door atmosphere in which the Family Court operates.[8]

Moreover, the trial judge's representation to the parties, that the "reading" he obtained from Dr. Keeler "wouldn't be in evidence or anything like that" (*see* note 7, *supra.*), was not correct. It was in fact treated as evidence. In denying Mrs. Rug-

gles' motion for reargument, the trial judge stated:

> In paragraphs 2 and 3 of her motion respondent questions the emotional impact of the visitations on the children and the desirability of psychological and home evaluation studies. *I believe these concerns are answered by the addendum to my previous disposition.* (Emphasis added.)

▮ In the courts of Delaware persons are to be accorded the most scrupulous adherence to the constitutional mandate of due process. Del. Const. art. I, §§ 7 & 9; *In re Opinion of the Justices*, Del.Supr., 246 A.2d 90, 92 (1968). The Family Court is no exception to that unalterable rule.

---

7. Initially, counsel for Mrs. Ruggles acquiesced in the trial judge's proposal, but viewing the full record, it is apparent from the very cursory way the matter was handled that both parties not only harbored doubts, but gave an equivocal consent at best. Moreover the trial judge's representations as to the use he would make of this information were contradictory and confusing:

> THE COURT: Okay. I, I hear you—I think, I think what I may do, we, we have a psychiatrist on staff here, uh, Dr. Keeler. Uh, if, if, if there is, uh, I think before I do anything, I would like to get a *reading* from her. Do you have any objections to that? *This wouldn't be in evidence or anything like that.*
> MR. HEIMAN: Excuse me? I didn't ...
> THE COURT: What I would like to do would be to discuss the situation with Dr. Keeler and see—she is a psychiatrist.
> MR. HEIMAN: Yes, Sir.
> THE COURT: And, and see what, whether or not she feels how she feels—whether it would be, in view of the circumstances whether there should be testing before the visitation begins or whether visitation should begin and then testing be done, or whether no testing would be appropriate. Would you object to that?
> MR. HEIMAN: No, Sir. I think it's entirely appropriate.
> THE COURT: Would you object to that?
> MR. [RIGGS]: I would like to know how they would find out if it would be, if it would be harmful to them with the visits not starting in. I mean, that's what I would like to do. How would they do it?
> THE COURT: Well, the psychologists, the psycho—...
> MR. [RIGGS]: What are they going to do— ask the five year old kid if he want ...
> THE COURT: Well, obviously, obviously it's going to be—your point is a good one. The

children are so young that it's pretty hard to ...
> MR. HEIMAN: I—from Mrs. Ruggle's testimony, Your Honor, uh, she has at least indicated that the oldest child is evidencing some kind of, uh, neurosis relating to the situation.
> THE COURT: Uh, she said he gets nervous?
> MR. HEIMAN: Yes, Sir.
> THE COURT: Alright ...
> MR. HEIMAN: And, the youngest child, he's been there once. I don't know whether it's appropriate for him to continue to go down there. *I do not know.*
> THE COURT: Okay. What I will do is talk to the psychiatrist and—just generally—and, uh, then, then I will decide whether the visitations, whether—first of all, whether there should be any visitation; secondly, if I decide that there should be, how often it should be; uh, and thirdly, as part of that overall picture, whether or not there should be psychologicals for the adults involved. And, *I will then render an opinion based upon, after that interview.*
> Anything further?
> MR. HEIMAN: Yes, Your Honor. There's the question with regard to the paternity. Does Your Honor suggest that there should be a separate petition filed in Delaware?
> (Emphasis added.)

8. Family Court Rule 370 provides:

> All records of proceedings before the Court shall be private and shall not be open or available to anyone except (1) the Court and its staff, or (2) the parties and their attorneys, or (3) other courts and public agencies, or (4) persons specifically approved by the Court because they have a legitimate interest in the records, subject in all events to reasonable limitations as the Court may impose.

*Abdel G.S. v. Badrban H.K.,* Del.Supr., 453 A.2d 94, 96 (1982). The rights to confront and cross-examine witnesses at trial are not to be waived by the simple expedient of extracting a party's consent under the circumstances occurring here. The efficacy of this principle becomes manifest when the inadequate record in this case is measured against the applicable law regarding the *children's* best interests and welfare.

The entire record is devoid of any inquiry into the pertinent question of George's fitness as a role model. Instead, both the mother and her present husband were criticized for their opposition to such visits. Moreover, under these unique circumstances the record does not indicate to what extent, if any, the Family Court considered that there is a possible interest in promoting the present marital relationship between Mona and Thomas, and preserving intact an existing family unit, particularly since a stable marital-familial relationship would likely serve the best interests of the children. Given the circumstances here, the trial court would have been well advised to consider the very cogent statement of principles announced by Chief Justice Herrmann in *Petitioner F. v. Respondent R.,* Del.Supr., 430 A.2d 1075, 1079 (1981):

> "... in this case ... there exists the very powerful public interest in promoting the marital relationship, preserving intact an existing family unit, and protecting the minor child from confusion, torn affection, and the *lifelong stigma of illegitimacy.* Thus, even assuming arguendo that the putative father has a constitutionally cognizable interest, that interest would be outweighed by the competing public interest and public policy in this case, and he must be denied judicial access."

430 A.2d at 1079 (Emphasis added).

Thus, it is difficult to understand the Family Court's criticism of the stepfather, Thomas. Not only has he earnestly tried to provide the role of father to these children, and to relieve them of the stigma of illegitimacy, but he also provides for their financial support as well. Indeed, as to the latter, it is his legal duty.[9] When the law imposes a responsibility on one, which is met, certain privileges may be assumed to flow therefrom. *See Daber v. Division of Child Protective Services,* Del. Supr., 470 A.2d 723, 726 (1983). Certainly this gave the stepfather a right to be heard, and his views respectfully and courteously considered by the Family Court.

Moreover, the entire concept of forcing young children to travel on a monthly basis to a state prison to see a man, who may not even be the father of one of them, and whose paternity as to the other was allegedly the product of a rape, was given scant attention. Instead, the focus was on what was "beneficial" to George (see note 6). Despite these serious questions affecting George's standing to seek such visitation, the real question concerning the welfare and best interests of the children do not appear to have been addressed in the record. Indeed, the undisputed evidence was that visits with George would be detrimental. The mother testified:

> MR. HEIMAN: Do you feel that it would be in the best interests of your children for them to visit Mr. [Riggs]?
>
> MRS. [RUGGLES]: I, I don't think it, it would. I, I can't say for sure. I'm not a psychologist, or anything like that. I don't know, but everytime my older son hears his name, *it makes him a nervous wreck.* It, it really does. And, it makes me nervous to see him that nervous. My younger son I don't think he, he probably wouldn't want to go because it's a strange place, but he wouldn't even know who he was. He doesn't know George at all. (Emphasis added.)

---

**9.** 13 *Del.C.* § 505(a)(4), mandates the support of a stepchild. It provides in pertinent part:

 (a) The duties of support ... shall be performed according to the following order of priority:

 (4) Duty to support a stepchild ...
*Id.* § 505(a)(4).

Yet, the center of the Family Court's attention seemed almost entirely on enforcing George's questionable paternal rights without the record demonstrating any focus upon the best interests of the children. Rather than carefully examining those alleged paternal rights, the Family Court refused to do so.[10]

 Certainly, this was a threshold issue, since visitation under 13 *Del.C.* § 727, is limited to a "parent". Instead, the trial judge directed the mother to file a "paternity" suit if she wished to challenge George's standing to seek visitation. But that was hardly meaningful. Presumably, the action to which the Court referred relates to the enforcement of a "duty to support" under 13 Del.C. §§ 501 & 511.[11] Considering George's 20 year prison term and his indigency, the whole concept of support from him becomes rather academic. Thus, the Family Court suggested that the mother's only recourse was to pursue an empty, meaningless remedy.

 Aside from the unresolved paternity issue, there also was uncontradicted evidence of harm to the children, but no effort was made to have them properly examined to determine the emotional impact of the prison visits on them, even though the trial judge had been warned in his ex parte communication with the psychiatrist that such visits would not succeed unless the mother was "supportive". The Family Court's only reaction was to order the mother "to be supportive". No apparent attention was given to the desirability of psychological and home evaluation studies, which the mother requested, before these prison visitations were ordered. Given all of these circumstances, we must conclude that the record cannot support the order entered here. *Wife (J.F.V.) v. Husband (O.W.V., Jr.),* Del.Supr., 402 A.2d 1202, 1204 (1979).

### III.

Finally, we come to the other points raised by the mother: the comingling of the "grandparent" matter with this proceeding, and the Family Court's unauthorized sua sponte notification to the Bureau of Vital Statistics of a "problem" respecting the legitimacy of these two children.

 As for the references to prior proceedings in the "grandparent" matter by both the Family and Superior Courts, it has long been a principle of law in this State that although a judge may take judicial notice of the record and pleadings in the

---

**10.** The trial court's continued refusal to consider the issue of paternity, even though it acted sua sponte regarding the children's legitimacy, is difficult to comprehend. The trial judge was adamant in this position:

> MR. HEIMAN: ... depending upon the Court's feeling with regard to this matter. If the Court is going to consider that visitation is appropriate, I would ask for a staff investigation with psychologicals to determine whether it's appropriate for the children to deal with this. *Additionally,* uh, similarly we would request, uh, at least *as far as the question with paternity is concerned with [Edward]* that the issue be set up, set up for a hearing and that the appropriate tests be made.
> THE COURT: You'll have to do that. I'm not going to. I have *one thing* before me today *and that's the visitation.* So, you can do, you can do ...
> MR. HEIMAN: I accept that Your Honor ...
> THE COURT: You can do those things, but not to me right now. (Emphasis added.)

**11.** The thrust of these statutes relates to a duty to support minor children, whether born in or out of wedlock. They have no other principal purpose. Thus 13 *Del.C.* § 501 provides in pertinent part:

> "(a) The *duty to support* a child under the age of 18 years, whether born in or out of wedlock, rests primarily upon his parents.
> 　　*　　*　　*　　*　　*　　*
> (c) The *duty to support* a child under 18 years of age, whether in or out of wedlock, shall rest equally upon both parents." *Id.* (Emphasis added.)

The nature and purpose of the cause of action, directed to the support of a minor, is evident from 13 *Del.C.* § 511, which provides:

> "Proceedings may be instituted in accordance with rules adopted by the Court, or upon a petition in which the petitioner alleges that defendant *owes petitioner a duty of support* and has refused or failed to provide such support." *Id.* (Emphasis added.)

case before him, it is not proper to sua sponte examine or consider court records in other actions and proceedings without giving full notice to the parties and without giving them an opportunity to explain or rebut such documents and records. *Lifmann v. Aronson*, Del.Supr., 212 A.2d 403, 404 (1965). The reason for this is that neither the parties and counsel, nor an appellate court, will know to what extent the trial court based its decision upon such earlier proceedings. *Lifmann v. Aronson*, 212 A.2d at 405.

With respect to the Family Court's sua sponte notification to the Bureau of Vital Statistics, that there was a "problem" concerning the legitimacy of these two children, we are faced with a most serious matter. An action to determine the efficacy of the legitimation procedure followed by Thomas Ruggles under 13 *Del.C.* § 1301 has not been filed with or properly heard by a court. Thus, we do not express any opinion on the merits of what the mother and stepfather attempted to do here.

While refusing to examine the issues of paternity, and attempting to resolve the thorny problems presented, the Family Court instead chose to sua sponte cast public doubt on the legitimacy of two young children. The trial judge had no authority to take such action, and it did not resolve or accomplish anything, except to inflict potentially grievous harm upon the future lives of innocents.

Whether the stepfather, Thomas, had properly legitimated these children had nothing to do with the issues of visitation. He admittedly was not the natural father, and obviously could not unilaterally terminate another's parental rights. Thus, any attempted legitimation as occurred here could not bar a bona fide claim to visitation by a natural parent. Both the Family Court and Superior Court recognized this when they concluded that the legitimation procedure was no bar to such visits. But the detour the Family Court took can only inflict great hurt without resolving a single legal or factual issue. See *Petitioner F. v.*

*Respondent R.*, 430 A.2d at 1079. Clearly, when the alternatives are weighed, there can be but one compassionate result—the rights of innocent children are not to be affected by summary court action of this type. If George is the natural parent and entitled to assert his rights as such, then let that issue be properly resolved. If the attempted legitimation of these children is a nullity, then let it be decided in an appropriate proceeding and upon a proper record. But in the absence of such proceedings, on no account was the Family Court's action justified.

The result must be that on remand the Family Court will be instructed to rescind its action, so that all sua sponte attempts by it to cast doubt on the legitimacy of these children shall be expunged from the records of the prothonotary and the Bureau of Vital Statistics.

### IV.

Upon this record we must conclude that the Family Court abused its discretion. Accordingly, the judgment of the Superior Court, affirming the decision of the Family Court, is reversed. The matter is remanded to the Superior Court with instructions that it reverse the Family Court and remand the case to that court for further proceedings only if requested by the petitioner, George Riggs. In the event of any such further proceedings the Family Court will be directed to receive and consider all relevant available evidence concerning the paternity of Edward, and from a legal standpoint shall consider the extent of George Riggs' paternal rights in a child, who it is claimed, is the product of a rape, the reasonableness of any visitations sought, considering George's role model upon the children, their best interests, including their physical health and emotional development, and the desirability under the circumstances of preserving intact the existing family unit created by Mona and Thomas Ruggles. Before any final determination of visitation the Family Court will be required to have the children properly

examined by a staff psychiatrist or psychologist regarding the emotional impact of prison visitations on them. Moreover, no visitation will be ordered without full and careful psychological and home evaluation studies of Edward and Bruce.[12] Finally, the Family Court will be instructed to rescind its sua sponte summary action regarding the legitimacy of these two children. Promptly upon the issuance of the mandate, the trial judge shall file all relevant documents with the Clerk of this Court evidencing rescission of that action. Jurisdiction shall be retained for that limited purpose. Following such compliance on remand, the matter will be reassigned to a different trial judge.

\*　　\*　　\*

REVERSED AND REMANDED WITH INSTRUCTIONS.

**12.** Needless to say, all such studies, evaluations and opinions must be presented in Court and coupled with the right of cross-examination.