**In re the Matter of Tara RAHN \*,**

v.

**Anthony NORRIS.**

No. CS99–03984.

Family Court of Delaware.

Submitted: March 13, 2001.

Decided: May 9, 2001.

---

\* Pseudonyms have been assigned to the parties to protect their identities.

Lorraine Phillips, Law Offices of Edward C. Gill, P.A., Georgetown, for mother.

Anthony Norris, Georgetown, pro se.

HENRIKSEN, J.

This is the Court's decision on the petition of Tara Rahn ("mother") to obtain sole custody of her five (5) year old son, Anthony David Norris, and also to modify the visitation rights of Anthony Norris ("father"). It is mother's desire that father have no visitation at this time because father is presently incarcerated.

## BACKGROUND

The parties were married September 16, 1995, separated July 11, 1999, and the divorce became final on August 9, 2000. Anthony James David Norris, their five (5) year old son, was born February 14, 1996. Pursuant to a prior Temporary Consent Order dated December 2, 1999, sole custody was temporarily awarded to mother, and father's visitation was stayed while he was in prison.

It is particularly significant that father is presently incarcerated at Sussex County Correctional Institute. On August 4, 2000, Judge T. Henley Graves of the Superior Court of the State of Delaware sentenced father to a five (5) year imprisonment on various charges that arose out of an incident occurring on July 12, 1999. On that night, father smacked mother in the side of her face, rupturing her ear drum, dragged her out of the car while kicking her on the ground and then attempted to force himself upon mother sexually. Much

of this conduct was observed by then three-and-a-half (3–1/2) year old David. The sentencings were on charges of attempted rape in the fourth (4th) degree, second (2nd) degree assault, and endangering the welfare of young David. In October of 1999, while father was out on bond, he committed the act of fourth (4th) degree rape upon another unrelated individual.

The other extremely complicating nature of this action is that five (5) year old David suffers from Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), and Post–Traumatic Stress Disorder.

### EVIDENCE PRESENTED

The Court first heard testimony from Cori Meek who was employed by Catholic Charities as an Intensive Outpatient Worker, has her Master's degree in education, with a major in guidance and counseling, and has been licensed since 1997 as a professional counselor in mental health, giving special attention to child therapy. Ms. Meek is supervised by a licensed clinical social worker.

Ms. Meek recounted a history for David whereby David attended a day treatment center for approximately six (6) months somewhere between the ages of two-and-a-half (2–1/2) to three-and-a-half (3–1/2) years, and which ended in June of 2000. This day treatment center involved classroom training for David five (5) days a week from Monday through Friday. Unfortunately the day treatment center closed in June of 2000, at which time David was moved to intensive outpatient treatment.

Ms. Meek went on to state that records reflected David attended Early Choices from approximately three-and-a-half (3–1/2) years to four (4) years of age. He demonstrated difficulty with peer relationships, and he was extremely aggressive and angry, often hitting and spitting on other children, and biting other children so that they were injured. At that time, David also demonstrated sexually inappropriate behavior which involved pulling his pants down, pulling on his penis, and making sexual advances towards other children.

It should be noted that Ms. Meek began specifically working with David in late December of 1999, which came six (6) months after the July 19, 1999, incident in which father assaulted mother in David's presence, and for which father was later incarcerated. Ms. Meek noted that children often model adult behavior. In December of 1999, Ms. Meek observed in David severe cussing, hitting, kicking, biting of other children, and also hostility against teachers and counselors. David's behavior was severe enough that it prevented him from going into regular daycare.

In June of 2000, David was diagnosed with three (3) major areas of psychological problems. The first area was Attention Deficit Hyperactivity Disorder (ADHD). By reason of this disorder, David demonstrated an inability to attend to tasks normal children can do, he was unable to remain still, he acted without thinking, and he was extremely impulsive.

David was also diagnosed with Oppositional Defiant Disorder. Pursuant to this disorder, David openly defied instructions, and often did exactly the opposite from what he was instructed to do. David fit into this disorder by his regular lack of regard for persons with authority.

The final major diagnosis of David made in June of 2000 was that of Post–Traumatic Stress Disorder. Ms. Meek opined that David's intensely aggressive behavior stemmed from David's prior observation of

domestic violence seen been father and mother, and father's eventual arrest.

Eventually, the sexual concerns about David resolved, and this was no longer a concern of Ms. Meek at the time of the trial. David is taking Atarol, a psychiatric stimulant which helps the ADHD. He also takes Risperdol, an anti-psychotic medication which helps manage anger. Ms. Meek testified that David will require intense one-on-one instruction in the future, and that it may not be possible for David to attend regular schools. He continues to be extremely impulsive, and poses a risk for injury to others as well as to himself. Presently, David's play is, as described by Ms. Meek, "traumatic", with a "heavy incarceration component". David's play often involves placing the other person in jail for doing something bad. Ms. Meek believes that David is reflecting his memory of his father's arrest.

In March 2000, the team of counselors at Catholic Charities, of which Ms. Meek was one of the group, noted that David continued to be aggressive, causing concern, and that the Catholic Charities did not feel visitation by father was appropriate at this time until they knew more about David. It was the counselors' concern that contact with father at this time might increase negative stimulus to David recalling past bad events.

In her own words, Ms. Meek indicated the following current opinions at the time of trial:

1. Ms. Meek felt that David was asking appropriate questions about his father, and wanted to know where his father was and where was the jail.
2. Ms. Meek believed that David has an attachment to his father and misses his father and cares for him.
3. Despite the above two (2) opinions, Ms. Meek further testified that she did not believe that it was in David's best interest to be in the prison environment, because it could trigger past memories of bad events.

Although Ms. Meek did not support visits at the prison at this time, she noted that it would be appropriate for David to send photos and pictures and a letter to father, and that there could even be certain supported telephone contact between David and father. Phone contact should be supported by the involvement of a neutral mental health individual who would oversee the questions father might ask, and also monitor David's conduct during the conversation, with follow up counseling between David and the counselor after the conversations.

As Ms. Meek's testimony continued, she expressed concerns about the physical environment of the prison that might present a sterile and institutionalized environment. Ms. Meek indicated that even passing through the prison gates could be traumatic for David. On the other hand, Ms. Meek briefly indicated that if the prison had a good environment, with furniture, toys, and a comfortable situation, visitation in this environment might be possible. Upon this Judge's question, Ms. Meek indicated that she had never seen the visitation room at the prison.

The Court next heard the testimony of Laura Brittingham, a Child Mental Health Mentor. Ms. Brittingham had worked with David by taking him out into the community approximately fifteen (15) to twenty (20) hours per week. Ms. Brittingham's mentoring program had included taking David to the library, museums, out to eat at McDonald's, and to the beach. Ms. Brittingham noted that David's solution to solving a problem is hitting. At one time, if David wanted to ride in a swing, he would simply knock the other child out of the swing. After six (6)

months with Ms. Brittingham, David had made progress. David was now going to the other child and asking whether that child would be willing to allow him to use the swing. Although there is improvement, David continues to have problems with rules, and shows aggressive behavior. As recently as two (2) weeks before the trial, David had shoved one child to get a toy, and hit another girl. As a result, Ms. Brittingham told David that he would not be able to go to McDonald's. As Ms. Brittingham was driving David home while David was strapped into the child seat in the back seat, he was able to undo the seat, grab Ms. Brittingham by her hair from the back, and start yelling that if he was not allowed to go to McDonald's, he would do it again. According to Ms. Brittingham, David was saying words that would "put a sixty (60) year old sailor to shame". He also said "cry like my mommy does". Ms. Brittingham testified that when she asked David why he demonstrates the violence he does, David's response was "my daddy hits". Ms. Brittingham confirmed that David has been extremely impulsive in his actions with no interim thought.

Ms. Brittingham closed her testimony by noting that David missed his father, has expressed a desire to see his father, and has even threatened to do something really bad so he can go to jail and see his father.

The Court next heard the testimony of Tara Rahn, David's mother. Ms. Rahn first recounted the brief history of her marriage with father, and then gave details about the incident in July of 1999 when she was dragged out of a car and beaten by father in David's presence. Mother testified that she first noticed problems with David when he as about age two (2) to three (3). David then went to Child Watch which ceased in June of 2000. David was at Bayport Daycare beginning

March of 1999, but was asked to leave in June of 1999 when he was hitting other children, biting, and cursing. Thus, David left the Bayport Daycare approximately one (1) month prior to the serious assault by father of mother in July of 1999. Mother testified that David had bitten other children so badly, that they have had to go to the doctor. David also one time took a block and hit a teacher in the back of the head causing the teacher to be out of school for three (3) weeks. She also indicated that David has always used foul language, and probably learned it from his paternal grandfather.

Mother testified that she now lives with a boyfriend, Richard. Mother indicated that David listens to Richard. She also indicated that the medication David is on also is helpful. Mother related that several years ago, David witnessed father slapping her in the face and giving mother a bloody nose. She recalled that David would often hear his parents arguing, and David would cover their mouths. Apparently, when David was three (3) years of age, according to mother, he witnessed mother pushing a chair over on the floor, and father picking up a piece of it and throwing it. David recently recalled that incident.

Mother testified that she has no physical problems, except that both she and father do at times suffer from a bad back. Mother received a high school diploma, while father did not graduate from high school. Mother testified that she accepts some of the blame for David's behavior, noting that she should have left the marriage sooner. She also testified that she is not presently receiving child support from the father.

As bad as the relationship was between mother and father, it is clear from mother's testimony that David was very close to his father. Mother testified that father was not violent towards David, except in a

few a discipline situations over the years. She also testified that David's father used a lot of profanity around him. Apparently, father was a good provider for his family, but also had little time for his family. But when father was around, David was always with father. As mother testified, "David liked being with his dad, and going with his father to do things." Mother testified that she could not recall many times when father disciplined David, and that father would use time out as a form of discipline. She indicated that David would listen to his father, and she believed that was because his father had a strong voice.

Mother testified that David is always asking about his father. She stated that she does not want to keep David from seeing his father, and that she has no problem with David seeing his father once he gets out of prison. She also stated that she would not have a problem with David seeing his father if David did not have to see chains, handcuffs, or prisoners in white uniforms. Mother did not believe that David could deal with the prison image at this time.

The Court next heard the testimony of Anthony Norris, David's paternal grandfather who was sixty-three (63) years of age. Mr. Norris indicated that he has seen a change in David since David's father was incarcerated. Prior to father's incarceration, grandfather would spend as much as three (3) times a week with David, but stated that he has not seen David as often since the incarceration. Paternal grandfather testified that he used to feel close to David, and that David behaved with paternal grandfather, and that David also behaved with his father. Paternal grandfather also testified that David's father was stricter with David than was David's mother. Paternal grandfather also stated that David's mother would pick on David's father, and even kick David's father in front

of David. Paternal grandfather also stated that David's mother would often undermine David's father's authority in front of David by taking away a punishment which had just been imposed by father on David, thus allowing David to go unpunished. Paternal grandfather also testified that he had had conversations with David's mother in which he told her that she needed to be tougher on David by disciplining him for things he had done wrong. Instead, however, according to the paternal grandfather, David's mother acted as if nothing had gone wrong even though David had misbehaved at school.

The Court next heard the testimony of Sylvia I. Norris ("paternal stepgrandparent") who was a retired teacher after having taught second (2nd) and third (3rd) graders for approximately thirty (30) years. According to Mrs. Norris, David generally behaved well, but would become a different person when his mother walked in the door. At those times, although David may have been behaving extremely well, he would suddenly erupt and do something very bad when his mother would arrive. On the other hand, according to Mrs. Norris, David's father did a good job with David, and David usually behaved in front of his father because his father spoke calmly, but decisively, to David. Mrs. Norris also observed David's mother on several occasions yell in David's father's face, undermine father's authority, and even noted that mother at one time admitted that she had struck David's father. On once occasion when Mrs. Norris attempted to talk to mother about hitting in the home, apparently mother responded by stating that she would not back down, and that she was used to fighting her sisters and also fought her brother. Finally, Mrs. Norris indicated that David has been presenting questions about the whereabouts of his father. Mrs. Norris indicated that David's father was placed in

special education classes when he was in the fourth (4th) grade. She also indicated that David's father has difficult reading, but she is proud that he eventually obtained his GED.

The Court heard from Wallace McNamara. Mr. McNamara and his wife own the house next door to where mother and father lived. They have a fifteen (15) year old daughter who often babysat David. Mr. and Mrs. McNamara were David's second godfather and godmother. Before father's incarceration, Mr. McNamara described David as an active child, who was "all boy." However, Mr. McNamara was quick to point out that before father's incarceration, David was not irate nor uncontrollable. After father's incarceration, Mr. McNamara testified that at first he saw no difference in David's behavior, but David was asking questions about his father's whereabouts. Mr. McNamara noted that David is generally well behaved when in his household, but he notes David's attitude starts to worsen when he knows that it is time to go home to his mother. As Mr. McNamara indicated, when David's mother shows up, it is almost as if someone "flipped a switch." Mr. McNamara also testified that David has been asking on many occasions when he could see his father.

Mr. McNamara also testified about his recollection of the evening of July 12, 1999, the date of the beating. Father had called over to the McNamara's and wondered if they had seen his wife, and that he was worried about her and had been out riding around to see if she was okay. Mr. McNamara also testified that he observed a motorcycle showing up regularly every night immediately following father's incarceration. The motorcycle was being driven by mother's present live-in, Richard.

Mr. McNamara also described the prison environment when he has visited with David's father. He indicated that the area in which he visits is all new, and that it is a neat, orderly area to visit. Although there is security and bars, he said everyone is polite, and that the visitation area is much nicer than he had expected. He had usually observed about a dozen visitors at the same time. He noted that the inmates are dressed in white, but are not in chains. He also indicated that there are guards in the room. Mr. McNamara also stated that he has observed that the inmates are able to touch and embrace the visiting persons. Mr. McNamara testified that he would be willing to take his five (5) year old daughter to the prison, but he also agreed that his daughter did not suffer from any psychological problems. Mr. McNamara had seen other children at the visitation center on several of his own visits.

The Court also heard the testimony of David's father, Anthony Norris. Father indicated that he would like to be able to see David at least three (3) times a month. When David was young, father was involved in David's life by giving him baths. He testified that when he was at home, his son would follow him everywhere. His son would follow him out to the garage, would love to go to work with his father, and would also love to go with his father to drag races.

Father also testified that there are other children who visit in the visiting room. He testified that it is quiet place with very little noise, and that there have been many small children in the visiting room.

When father heard the testimony about David's Post–Traumatic Stress Disorder, he believed it was due to more than one (1) incident. Although a non-professional, he did offer that he and his wife had argued all of the time. As to the regretful night of July 12, 1999, father testified that he could not justify his actions of that evening, and he wished it had never occurred.

According to father, he spent the evening calling around to various people to find out his wife's whereabouts, and he became worried about her safety. When she finally showed up at home, late, he lost it when she excused her lateness indicating she had to pick up other children, but at the same time was sweaty and smelled of men's cologne.

Father also testified that he had taken courses in domestic violence. In fact, he presented to the Court a workshop for training in non-violence alternatives to violence project, indicated that he has completed the basic Alternatives to Violence Workshop, the certificate being dated March 2, 2001. He also presented a Bridge Counseling and Therapy Center certificate of completion, indicating that he had completed the education course for separating and divorcing parents dated September 28, 1999. Father also presented a certificate of achievement from Child, Inc., certifying that he had successfully completed the twelve hour parent education course of Child, Inc. Family Support and Parent Education program, the certificate being dated December 13, 2000.

The Court recalled Cori Meek, the professional counselor first mentioned in this opinion, after the Court required the parties and counsel, as well as Ms. Meek, to visit the Sussex County Correctional Institute. As indicated earlier, Ms. Meek had never visited the prison. The Court wanted to know if Ms. Meek's opinion she had earlier given was changed in any way by reason of what she had observed at the prison. In her testimony following a visit to the prison, Ms. Meek noted the following observations and gave the following opinions:

1. The Court learned that the best times to visit at the prison, where there are the least people, are Wednesdays, Thursdays, and Sundays, at 8:30 a.m. Evenings should be avoided.

2. ADHD has a biological basis, but parenting helps shape a child and also helps shape the level of self-esteem and level of confidence, thereby assisting the child in dealing with ADHD.

3. Post–Traumatic Stress Disorder is environmental. It is not biological. According to Ms. Meek, the mother or the father's parenting skills have nothing to do with this problem. Instead, the problem was caused by the child's observation of domestic violence.

4. Oppositional Defiance Disorder is also environmental. Although not stating mother's parenting skills were the cause of this disorder in David, Ms. Meek indicated that mother's parenting skills, if they have existed as described by the neighbors and grandparents when she countermands authority, could be the problem.

5. Although Ms. Meek heard the sounds of metal detectors and radios, and saw razor wire, all as she had expected, she found the visitation facility much less intimidating on the inside than she had expected. After having visited the prison, Ms. Meek testified that she was not as definite about her prior opinion in which she opposed prison visitation for David. She was certain, however, that she continued in her concern about David experiencing a lot of stimuli. For instance, she would not want David visiting at a time when a large group of people would be having to move into the visitation center. She was also concerned that David not be required to stay in the intermediate room for a lengthy pe-

riod of time before going into visit with his father. She also believed that any contact David would have with his father needs to be supervised by a Master level therapist who would also be present during the visits.

6. In addition to the above, Ms. Meek indicated that visitation should require David to be able to have some items to play with, such as blocks, and also be able to have some room to experience free play. At the same time, however, she believed that David's visitation should be confined to the clergy rooms to give some privacy between David and his father, and to avoid the additional stimuli of other prisoners and children.

7. Ms. Meek testified that the frequency of these visits should be determined by the health personnel, and as visits moved on, David's overall reaction to the visits should be evaluated by the health care personnel to determine whether they should be decreased or increased.

8. Ms. Meek indicated that telephone contact and letters might also be appropriate, but again, they should be monitored by the therapist assigned to David's case.

9. David needs to be given factually accurate information to be monitored by his therapist. One must be careful that David is not misled to think that his father would be coming home in a few weeks.

10. Father also needs to learn what would be appropriate to discuss with David so as not to mislead David. Ms. Meek felt that there should be some type of support within the prison system to train father in this regard.

11. At this time, Ms. Meek still believed it was not appropriate for David to begin visits with his father. She believed that his behavior lately had been erratic. She testified that there first needs to be a reexamination of David's medications so that he becomes more predictable and less intense.

12. Once David is more stabilized, before visiting with his father, David needs to be desensitized by exposing David to some practice visits at the prison without father's involvement. This would include the health care worker taking David to the prison on some practice visits.

All in all, Ms. Meek believed that visitation of father by David could be possible, but should only occur after David's present irregularity is stabilized through proper reevaluation of his medication, and only after David then becomes acclimated to the prison environment before he meets with his father. Visits at the prison should then proceed with his father, the frequency of which would be monitored by the health care evaluators assigned to David, and which at all times should be attempted in the least stimuli-affected environment.

Finally, the Court deemed it appropriate, with the consent of the parties, and in the tape recorded environment of the court room, to meet with five (5) year old David, accompanied by his counselor, Cori Meek. Needless to say, it became quickly evident to the Court that David suffers from a speech problem, and that it was difficult if not impossible to hold his attention. Upon entering the court room David briefly sat in a chair, and then got up and moved everywhere about the court room, opening windows, asking questions, disassembling cushions and chairs, stomping his feet at times, crawling under a desk, and showing a considerable amount of interest in the

microphone and whether or not the conversation was being tape recorded. The only time the Court could get David's attention was when the Court asked David if he wanted to see his daddy. At that point, David looked directly at the Judge on one of the few moments of eye contact, and stated that he likes to hug his daddy, and wanted to know if he would be able to see his daddy today. When the Court explained to David that it would not happen today, David stomped away angrily. Eventually, David's attention was again obtained when he was again asked if he wanted to see his father. When David was asked how that would make him feel, he indicated that it would make him "happy." David was asked what he liked to do with his father. He indicated that he liked to have his father take him to the house and take him to the race track. When David was asked what he liked to do at the race track and what he liked about the race track, he dropped to the floor, zoomed across the cushions which he had thrown on the floor, and then got up and jumped up and down. It was clear to the Court from this interview, and noting that David was probably under a considerable amount of anxiousness about the interview, that David was overloaded in his coping abilities, and, except when questions were asked about his father, he was completely oblivious to anyone else in the room, and was also out of control.

### LAW AND REASONING

██ The real issue in this action is whether or not father should be allowed visitation of his five (5) year old son, David, where father is incarcerated for at least three (3) more years, where the child suffers from serious emotional problems, including ADHD, Oppositional Defiant Disorder, and Post–Traumatic Stress Disorder, but where the father, prior to his incarceration, was actively involved generally as a positive influence in young David's life.

██ In this action, the issue of joint versus sole custody is not a pivotal issue. In fact, father never contested the issue of mother having sole custody; instead, father simply looked for visitation. Indeed, pursuant to 13 *Del. C.* § 703A (b), having committed a felony level assault against mother, father meets the definition of a "perpetrator of domestic violence." Pursuant to 13 *Del. C.* § 705A (a), there is a rebuttable presumption that no perpetrator of domestic violence shall be awarded sole or joint custody of any child. Pursuant to 13 *Del. C.* § 705A (c), that presumption can be overcome if there have been no further acts of domestic violence and the perpetrator of domestic violence has (1) successfully completed a program of evaluation and counseling designed specifically for perpetrators of family violence and conducted by a public or private agency or a certified mental health professional; and (2) successfully completed a program of alcohol or drug abuse counseling if the Court determines that such counseling is appropriate; and (3) demonstrated that giving custodial residential responsibilities to the perpetrator of domestic violence is in the best interest of the child. The presumption may also be overcome if the Court finds extraordinary circumstances that warrant the rejection of the presumption, such as evidence demonstrating that there exists no significant risk of future violence against any adult or minor child living in the home, or any other family member, including an ex-spouse. At this time, the father is incarcerated for a crime which makes him a perpetrator of domestic violence. Although father has submitted a certificate reflecting that he has completed a basic alternative to violence workshop course in March of 2001, as well as general parent education courses, the

Court does not find these courses of the sufficient and necessary quality necessary to remove the presumption. Therefore, at this time, sole custody of the child is awarded to mother. If the father entertains hopes in the future of obtaining joint custody and/or possible placement of David, he should realize and take action now to obtain the proper courses specifically designed for the evaluation and counseling of perpetrators of domestic violence. Father is also reminded that he should not commit any further acts of domestic violence. Although this Court does not feel the need for father to pursue a program of alcohol or drug abuse counseling, the Court does believe, considering father's two convictions of rape-oriented offenses, that he should pursue a program of evaluation and counseling directed towards sex offenders.

There have been several cases in the State of Delaware which have analyzed the requests by incarcerated fathers to have visitation of their children. The pivotal case in this area was the Delaware Supreme Court decision in the case of *Ruggles v. Riggs* 477 A.2d 697 (1984). In *Ruggles,* the lower Court had allowed visitation of a seven (7) and five (5) year old at the prison where the putative father was serving a twenty (20) year jail sentence. The Lower Court record demonstrated little in the justification for the lower Court Judge to award such visitation. In overturning the lower Court's grant of visitation, the Delaware Supreme Court noted that in deciding a case, a Court must consider the best interests and welfare of the children. The Supreme Court also emphasized that in considering those best interests, the Court must give special attention in noting that it is forcing young children

to visit someone in prison. In *Ruggles,* one of the serious defects in the alleged father's application was that there was not sufficient proof that he actually was the father. The Supreme Court believed that the paternity determination should have first been made clear. The Delaware Supreme Court then went on to note that if the visitation is not determined to be harmful, it will then be reasonable. In *Ruggles,* the Court went on to note that the Court should consider the father's fitness as a role model, whether or not any testimony indicated the visits would be detrimental, the reasonableness of the visitation, and the childrens' best interests, including the childrens' physical health and emotional well-being. In *Ruggles,* the Delaware Supreme Court also believed it important that the Court order a psychological evaluation to determine the emotional impact prison visitation would have on the children.

As an aside, and not relevant to the present case, *Ruggles* also considered a public policy issue where a stepfather had filled the gap of the absent father, and created a real father image for the children and a real family for the children. It is noted in passing, however, that this public policy doctrine, which is somewhat equated to the doctrine of equitable estoppel, was minimized, if not abolished, by Delaware's passing of the Uniform Parentage Act.[1]

The Delaware Supreme Court then extended the *Ruggles* logic to an incarcerated father who, although not married to the mother, was clearly the father.[2] In the *Winter* case, the Delaware Supreme Court denied father's visitation where it held that a two (2) year old's periodic and on-going visits in prison were not in the child's best

---

1. See *June E. v. Dominick E.,* Del.Fam., 487 A.2d 1149 (1984), discussing 13 *Del. C.* § 801, *et. seq.*

2. See *Winter v. Charles,* Del.Supr., 608 A.2d 731 (1992).

interests, given the eight (8) year lengthy term of father's incarceration. Although agreeing that a parent's visitation rights are a legal and important right, the Delaware Supreme Court noted that such rights must yield to the best interests of the child.

In another case, the Delaware Supreme Court denied visitation of a two (2) year old by a thirteen (13) year term incarcerated father by following the *Ruggles* decision and noting the poor role model the father would present, the serious nature of the father's crime, and the tender age of the child.[3]

Noting the previous decisions, Delaware Family Court Judges have often denied incarcerated fathers visitation where there is a very young child, and where the father has had no previous meaningful contact.[4] Family Court Judges have also denied visitation to incarcerated fathers where the incarcerated father has indicated by his actions that he still poses a threat to mother and/or children either because of his own outward intentions[5] or where the father suffers from serious mental problems in which he harmed both mother and the children previously, and even was later convicted for a terroristic threatening felony for a called in bomb scare to the Family Court.[6]

In a more recent decision, Family Court Judge Waserstein allowed visitation by

certain children ages six (6) through sixteen (16) where the father had a short time of nine (9) to ten (10) months incarceration remaining, even though the father had previously harmed both mother and children, and had learned that he could hurt mother mentally by hurting his children physically. In this particular decision, Judge Waserstein allowed visitation at the prison one (1) time per month noting that some of the children expressed a desire to visit with the father despite what had occurred, and further requiring that the children who had difficulties with the visitation would be prepared by a therapist.

In a well-reasoned decision in 1994, Judge Walls granted prisoner visitation rights to a father who had a two (2) year sentence remaining on a crime of raping the mother. The children were one-and-a-half (1–1/2) to three (3) years of age. In that case, although mother believed that a prison was no place for her children to visit, mother admitted that the visits would not create any emotional harm for her children. Father had pointed out that there was a special area for the father to visit the children in the prison, and that he had a good relationship with his children prior to his arrest, and that he cared for the children. Mother also stated that she would have no objection to visitation by the natural father if he was not incarcerated.[7] As Judge Walls noted in this decision

3. *Morris v. Morris*, Del.Supr., 610 A.2d 726 (1992).

4. See *Phillip S.R. v. Rita A. W.*, Del.Fam., File No. CN95–08989, 1996 WL 798773, Crowell, J. (August 21, 1996), (Fifteen [15] month old child/eighteen [18] month term) and *William F.B. v. Donna L.C.*, Del.Fam., File No. CV94–07271 (95–26981), 1996 WL 862377, Tumas, J. (October 10, 1996) (Three [3] year old and three [3] more year term)

5. *William F.B. v. Donna L. C.*, Del.Fam., File No. CV94–07271 (95–26981), 1996 WL

862377, Tumas, J. (October 10, 1996) (Father threatened to kill mother during present visit).

6. *Mara C.D. v. Paul C.*, Del.Fam., File No. CN96–7446, 1997 WL 878688, Crowell, J. (July 25, 1997). See also *Julie B.F. v. Clarence S.M., Jr.*, Del.Fam., File No. CN95–08172 (96–20683), 1997 WL 905956 (November 10, 1997).

7. *In re Taylor M.F. et al*, Del.Fam., File No. CK91–4685, 1994 WL 811731, Walls, J. (February 15, 1994).

"being in prison, without more, does not preclude the exercise of visitation by a natural parent."

■ In the *Taylor* case, noted above, Judge Walls went on to comment on the present day Delaware statutes for determining appropriate visitation. Furthermore, in reviewing these present day statutes, this Court is mindful that they follow the philosophies set forth in the earlier noted decisions of our Delaware Supreme Court in the *Ruggles* case and the *Winter v. Charles* case. Thus, the standard for determining father's visitation rights in this case is found in 13 *Del. C.* § 728(a) which states as follows:

The Court shall determine, whether the parents have joint legal custody of the child or one of them has sole legal custody of the child, with which parent the child shall primarily reside and a schedule of visitation with the other parent, consistent with the child's best interests and maturity, which is designed to permit and encourage the child to have frequent and meaningful contact with both parents unless the Court finds, after a hearing, that contact of the child with one (1) parent would endanger the child's physical health or significantly impair his or her emotional development. The Court shall specifically state in any order denying or restricting a parent's access to a child the facts and conclusions in support of such a denial or restriction.

Noting that the father is a "perpetrator of domestic violence" as defined in 13 *Del. C.* § 703A(b), and who has a history of committing acts of domestic violence, the Court has the power to order father to complete a program of evaluation and counseling designed specifically for perpe-trators of family violence, as well as other counseling that the Court deems appropriate.[8] In this case, noting the two (2) rape-related charges against father, one against mother and one against an unrelated third party, the Court believes that sex offender counseling is appropriate. The Court also looks to 13 *Del. C.* § 708A that "the Court shall determine a schedule, location and conditions for visitation that best protects the child and the victim of domestic violence from further violence." The Court also considers, assuming it does not find endangerment to the child's physical health or significant impairment of the child's emotional development, the best interests standards set forth in 13 *Del. C.* § 722. Reviewing those respective factors, the Court notes the following:

■ *Wishes of the child's parents and residential arrangements:* Father wishes to see David at least three (3) times a month. Similar to the *Taylor M.F.* case[9], mother does not have a problem with father visiting once he gets out of prison, but does have a problem with David visiting father at the prison. The psychological factors in this case, however, which will be discussed later, raise the question of whether David's visitation at the prison will cause him significant emotional harm. Since visitation would occur at the prison, this visitation arrangement will also be discussed at the same time as David's mental health concerns are discussed.

*The child's wishes:* Although this child is only five (5) years of age, the one thing that was clear to the Court in its interview with the child was that he wanted to see his father. David's desire to see his father was also testified to by several other witnesses.

---

8. 13 *Del. C.* § 707A.

9. *In re Taylor M.F. et al,* Del.Fam., File No. CK91–4685, Walls, J. (February 15, 1994).

*Interaction and interrelationship of child with significant others:* Based upon the testimony of the various individuals, the Court has determined that the father was a beneficial influence in David's life before his incarceration. Indeed, when father was not out working to be sure his family was paying all of its bills, David followed his father around all of the time. Furthermore, the testimony of several others, especially the neighbor, Mr. McNamara, demonstrated that the father exhibited a calming control over David through father's consistency and demeanor. On the other hand, the Court is concerned that mother has a prior history of demonstrating that she is unable to control David. In fact, the testimony of several revealed that David changes drastically when his mother appears from a somewhat controlled young man to a very out-of-control and impulsive child. There has been a continual problem of mother undermining the decisions of other authority makers, especially father, who have made disciplinary decisions which would have helped David, and which now cause David to understand that he can oppose authority. Indeed, the Court believes that mother's parenting skills, or lack of them, is the primary cause for David's oppositional defiance disorder.

*The child's adjustment to visiting the prison and the child's mental and physical health:* These considerations present the greatest concern for the Court. Certainly, father did something very foolish when in David's presence, he seriously assaulted his wife in July of 1999. The Court believes that father recognizes his grave mistake. The Court has continued concerns that father's attempted rape of his wife was followed by a later rape-related conviction of an unrelated individual. However, except for David observing the particular assault on the mother, and other regular violent actions between both parents for which both parents are responsible, father has not exhibited any domestic violence towards David. Unfortunately, David also suffers from the biologically-oriented psychological problem of ADHD. David also suffers from the environmentally created problem of Post–Traumatic Stress Disorder. In part, this problem may have been caused by the repeated arguments and minimal assaults that were conducted in the family home between his parents. In a much larger part, this problem was caused by David observing his father being taken away to jail after his father had committed a very bad act.

The Court listened carefully, and gave great weight, to the testimony of Cori Meek, the Catholic Charities Intensive Outpatient Worker who has worked on a regular basis with David since December of 1999. The Court's interview with David confirmed Ms. Meek's testimony about David's uncontrollable behavior, especially when he is presented in a new situation. The Court believes that all of Ms. Meek's concerns about minimizing stimuli to create a more successful and meaningful visitation are to be taken seriously. The Court's Order will reflect many of Ms. Meek's concerns and requirements, and the Court hopes that the Sussex County Correctional Institute will be able to comply with these requirements in order to create a meaningful visitation between David and his father. There is no question that it is in David's best interests to ultimately be able to visit with his father. And yet, the Court is mindful that the prison must by its very nature have certain security requirements and limitations, and the Court is hopeful that the prison can work with the counselor who will assist David in working out an arrangement not so disruptive of the prison's security so as to prevent visitation. The Court also respects Ms. Meek's' willingness, in the best

interest of David, to modify her initial opinion after she had had the opportunity to visit and observe the visitation center at the prison. The Court found that Ms. Meek was entirely interested in David's best interests and welfare, and the Court thanks Ms. Meek for her dedication to David's case.

*Past and present compliance by both parents of responsibilities to their child:* Just as in the *Taylor* case,[10] which granted visitation to the incarcerated father, and contrary to the decisions in *Phillip v. Rita,* supra.[11] and *William F.B. v. Donna L.C.,* supra.[12], father was a previous positive role model in David's life. As David gets older, however, he will better understand the nature of father's crimes, and it will be up to father, through counseling and his demeanor, to demonstrate to David that he has learned his lesson, so that he can continue to be a positive role model and overcome those serious questions which David will no doubt pose to father in the future. The Court also believes that mother has been a good mother, although the Court has already expressed its concerns that mother has taught David to not abide by authority and rules. Although the Court recognizes that some of the testimony given by the paternal step-grandmother may be somewhat prejudiced in her stepson's favor, the Court is inclined to give a certain amount of weight to paternal step-grandmother's accusations that mother has a defiant fighting personality. If this, indeed, is correct, mother needs to get counseling to evaluate and deal with this potential problem so as not to ad-

versely compound her child's problems in the future.

*Evidence of domestic violence:* The Court has already noted its concerns about father's domestic violence. At the same time, although nothing that the mother did justified the father's outrageous conduct, the Court is concerned that mother previously exhibited towards father and in the presence of David a lesser form of domestic violence.

## CONCLUSIONS AND ORDER

Based upon the foregoing facts, law, and reasoning,

**IT IS HEREBY ORDERED:**

1. Sole custody of Anthony David Norris, a male minor child born February 14, 1996, is hereby awarded to his mother, Tara Rahn.

2. Pursuant to 13 *Del. C.* § 727, 728, mother will be required to keep father informed about significant events and developments in David's life.

3. Father shall consult with the prison authorities, and, if able, shall obtain and successfully complete a program of evaluation and counseling designed specifically for perpetrators of domestic violence and conducted by a public or private agency or a certified mental health professional, and father shall also successfully complete a program of evaluation and counseling designed specifically for sexual offenders, also conducted by a public or private agency or a certified mental health professional.

---

10. *In re Taylor M.F. et al,* Del.Fam., File No. CK91–4685, 1994 WL 811731, Walls, J. (February 15, 1994).

11. *Phillip S.R. v. Rita A.W.,* Del.Fam., File No. CN95–08989, 1996 WL 798773, Crowell, J. (August 21, 1996).

12. *William F.B. v. Donna L.C.,* Del.Fam., File No. CV94–07271 (95–26981), 1996 WL 862377, Tumas, J., 95–26981 (October 10, 1996).

4. Mother shall within the next month enroll in, and thereafter successfully complete, a program of evaluation and counseling designed for domestic violence as well as for defiant and anger management control.

5. Each of the parties shall be prepared for the necessity of eventually presenting certificates of the professionals providing the above psychological counseling services to both parents, as well as the names, addresses and telephone numbers of these individuals for possible testimony in future Court actions to determine compliance with this Order. The parties shall present to each other as well to the Court, upon request, photocopies of the certificates of completion, and the names, addresses and telephone numbers of the respective individuals providing the counseling.

6. Father is hereby awarded visitation with David as frequently as possible, noting the following conditions:

   a. The visitation must be coordinated and approved by the warden of the Sussex County Correctional Institute, or such other warden of such other correctional institute that father may be incarcerated in, along with the therapist assigned to David's care. The therapist must be a Master level therapist. All visitation hereafter ordered is subject to the warden's necessary limitations made for the security interests of the prison, other prisoners, and other visitors. Although not the Order of this Court, it is the hope of this Court that visitation will soon involve visits between David and his father at least one (1) time per week.

   b. Subject to the coordination between the warden and the Master level therapist, visitation should occur at the least crowded time period so to avoid additional stimuli to David, should minimize the time in which David must go through the entry process before he makes contact with his father, and should be confined to a private room or the outside picnic area, with play things available. In addition, the Master level therapist should accompany David on all visits, and be present during all visits until such time as the Master level therapist deems their presence not to be necessary.

   c. Visitation shall include frequent telephone contacts and letters between father and David, all of which shall be monitored by the Master level therapist, and the frequency of which shall also be controlled by the Master level therapist, subject to any restrictions that the prison warden may also place on this communication.

   d. In addition to the previously noted required counseling, father shall also seek assistance from the prison authorities to obtain proper parent counseling, and father shall listen to and be guided by the recommendations of the Master level therapist so that no harm shall come to David by reason of statements or conduct made or acted out by father.

   e. It has now been more than two months since Cori Meek, on behalf of Catholic Charities, recognized that David was in need of a stabilization period requiring the adjustment of David's medication. If this has not already occurred,

this needs to be given priority. The stabilization period for David shall not last longer than May 21, 2001, at which time, if not sooner, a desensitizing process shall commence.

f. The desensitizing process whereby David is introduced into the prison visitation environment without seeing his father, so that David may become acclimated with the prison visitation environment, all conditioned upon the consent of the warden, shall be completed no later than June 11, 2001, with visitations between David and his father beginning no later than June 13, 2001.

g. The Court wants to be sure that David's visitation with his father moves along rapidly. However, the Court will accept from David's psychologist and/or the prison warden letters to extend the aforesaid date limits of stabilization and desensitizing where just cause is demonstrated for the need of such an extension in David's best interests or prison security interests. Copies of any such letters to the Court shall also be provided to both mother's attorney, Lorraine Phillips, Esquire, and to father.

h. It shall be *mother's responsibility* to be sure that Catholic Charities, or such other counseling agency as is treating David, follows through quickly and continuously on this Order to ensure that father's visitation is enacted according to the schedule and terms set forth herein.

7. A copy of this Order shall also be provided to the Warden at the Sussex County Correctional Institute in order that the Warden will be familiar with the Court's decision and the Court's request of the Warden's involvement in order to implement the visitation schedule.

**IT IS SO ORDERED.**